UNION STOCK-YARDS & TRANSIT CO. et al. v. WESTERN LAND & CATTLE CO., Limited.

(Circuit Court of Appeals, Seventh Circuit. December 1, 1893.)

No. 8.

1. CONDITIONAL SALE—AGREEMENT FOR AGISTMENT AND SALE OF CATTLE.
    Defendant undertook to transport plaintiff's cattle to his farm at his expense, and there feed and care for them for a period of several weeks, for the purpose of their being profitably marketed by plaintiff, agreeing that they should not deteriorate in flesh or condition; that he would pay at an agreed valuation for all losses from any cause, and would employ at his own expense a herdsman selected by plaintiff; his compensation to be the money realized from the sale of the cattle, exceeding a stated sum per head, after deducting expenses of shipment and sale; and he waived any lien against the cattle. *Held*, that the transaction was not a conditional sale, but a bailment.

2. SAME—RECORDING.
    Such transaction is not within the purview of Rev. St. Mo. § 2505, making conditional sales void as to creditors and purchasers, unless in writing and recorded.

3. PAROL EVIDENCE TO VARY WRITING.
    Such agreement being in writing, parol evidence of previous negotiations by defendant with plaintiff to purchase the cattle on credit is inadmissible.

In Error to the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

At Law. Replevin by the Western Land & Cattle Company, Limited, against the Union Stock-Yards & Transit Company, Simeon F. Hall, Jefferson E. Greer, William Hall, and Daniel Hall. Ver-
v.59F.no.1—4

dict and judgment for plaintiff. Defendants bring error. Affirmed.

### Statement by JENKINS, Circuit Judge:

The defendant in error brought suit in replevin to recover 300 head of Texas steers branded W. C. C. The declaration embraced three counts, one in the cepit, one in the detinet, and the third in trover. To the first and second counts, in addition to the usual pleas of non cepit and non detinet, there were pleas—First, of property in Simeon F. Hall, William Hall, and Jefferson E. Greer; and, second, of property in Daniel Hall. These pleas were filed by all the defendants to the suit, except Daniel Hall, who made default. The replication alleged property in the plaintiff, denying property in the parties named. At the trial a verdict passed for the plaintiff.

The bill of exceptions discloses that at the trial the plaintiff introduced three contracts between the cattle company (defendant in error) and Daniel Hall,—one dated September 6, 1884, one dated October 1, 1884, and one dated October 16, 1884. The first relates to 600 head of Texas steers, the second to 379 head, the third to 22 head, all branded W. C. C. The contracts are substantially alike in their terms. The following is a copy of the first: "This contract and agreement made and entered into this sixth day of September, 1884, by and between Daniel Hall, of Grundy county, Missouri, and the Western Land and Cattle Company, Limited, a corporation organized and existing under the laws of Great Britain, witnesseth, that the said Hall hereby agrees, within four days from this date, to receive of the property of this said company, a number not to exceed six hundred (600) Texas steers, beef cattle, each and all of said steers being marked and branded with the brand W. C. C., from the said land and cattle company, near Lexington Junction, in Ray county, Missouri, where said cattle are now located and pasturing, for the following purposes and upon the following express conditions, only, to wit: The said Hall is to transport said cattle from their present location to his farm in Grundy and adjacent counties at his (Hall's) own charge and expense, and said Hall is there to properly feed, fatten, and care for said cattle for the purpose of their being profitably marketed by said company, and to that end said Hall agrees that said cattle shall not deteriorate in flesh or condition from their present state, and said Hall is to commence feeding said- cattle corn by September 25, 1884, and keep it up while said cattle remain in his care; that said Hall shall be and is liable and agrees to pay for all losses of said cattle, arising from death, disease, escape, theft, or any cause whatsoever, at the agreed valuation of thirty-six (36) dollars per head. And it is further agreed by the parties hereto that the period of said pasturage and care of said cattle by said Hall shall extend to December 15, 1884, and that during said period, from time to time, the said cattle may and shall be shipped for sale, or sold where they may then be, by said company, by J. A. Forbes, its manager. And the said Hall further agrees to employ a competent herdsman, to be selected by said J. A. Forbes, whose sole duty shall be to attend to said cattle, and said Hall to pay said herdsman thirty dollars per month wages, and furnish board and lodging suitable for said herdsman. And, in full consideration for the full and faithful performance of all the acts and promises to be done and performed by said Hall as aforesaid, the said Hall agrees to receive in full compensation therefor all moneys that may be realized by said company from the sale of said cattle over and above the sum of thirty-six 05-100 dollars per head, after deducting all costs and expenses incurred by said company in and about the sales or shipments of said cattle. And the said Hall hereby, for himself, his heirs and assigns, expressly waives any lien, either as agister or of any other kind or character, or lien against said cattle which may arise during the performance of this contract, either by law or otherwise. And said Hall further agrees to keep and maintain said cattle while in his charge free from all claims, charges, liens, or liability whatever, from whatever source arising, except from the acts of said company or said J. A. Forbes." Delivery of 1,000 cattle under the several contracts was made. Of these cattle, 300 had been brought by Simeon F. Hall, William Hall, and Jefferson Greer, three of the plaintiffs in error, and composing the firm of

Hall, Greer & Co., from the farm of Daniel Hall, in Grundy county, Mo., and placed in the stock yards of the Union Stock-Yards & Transit Company, at Chicago. They were so taken and claimed by Hall, Greer & Co. under a chattel mortgage from Daniel Hall to them, dated December 13, 1884, of "three hundred (300) head of Colorado-Texan cattle, which are now being fed on my farm in Marion township, Grundy county, Missouri; said cattle being a part of the thousand cattle purchased by me of the Western Land and Cattle Company in September and October last. And I hereby certify that there are no other incumbrances against the 300 head of cattle hereby transferred. Said cattle being branded W. C. C. on the right side." The mortgage purports to be given to secure the sum of $5,000, with interest, on the 13th day of January, 1885, and was on the day of its execution filed for record in the office of the register of deeds of Grundy county, Mo.

Hall, Greer & Co. also gave evidence that at the time of the giving and the recording of the chattel mortgage the 300 cattle described therein were on the farm of Daniel Hall in Grundy county, and in his possession; that they saw the cattle there in the possession of Daniel Hall, and that, at the time they so loaned and advanced the money to Daniel Hall, they caused an examination of the records in the office of the recorder of deeds of Grundy county, for the purpose of ascertaining whether there was of record any lien or incumbrance on the cattle by way of chattel mortgage, bill of sale, conditional sale, or otherwise, and whether there was anything on the records of that office to show that Daniel Hall was not the absolute and unconditional owner of the cattle, in his own right, free from all liens or incumbrances of any kind whatever; that upon such examination nothing was found of record, showing that Daniel Hall was not such owner, nor was there any record of any incumbrance or lien by way of mortgage, bill of sale, conditional sale, or otherwise, except one chattel mortgage by Daniel Hall to Keenan & Hancock, of Chicago, Ill., on 150 cattle of the 1,000 cattle, to secure the payment of $1,000, and also a mortgage by Daniel Hall to Hall Bros., of Kansas City, on other of said 1,000 cattle, to secure the payment of $1,287.85; that at the time they loaned the money, and took such chattel mortgage as security therefor, they believed that Daniel Hall was such owner, and had no notice, knowledge, information, or belief that the plaintiff had or claimed any right or title to the cattle, or any of them, but that they did believe, in good faith, that Daniel Hall was the absolute owner of the cattle; that, at the time of making the chattel mortgage, Daniel Hall pointed out to Hall, Greer & Co. 239 cattle that were separate and apart from all other cattle, in a lot by themselves, and designated them as a portion of the 300 cattle described in the mortgage, and also showed and pointed out to Hall, Greer & Co. other cattle on his farm, to a greater number than 61, as cattle from which the remainder of the 300 cattle described in the chattel mortgage were to be taken; that afterwards Daniel Hall, with Simeon F. Hall, separated from the cattle so pointed out 61 other cattle, to make up the number of 300 cattle described in the chattel mortgage; that said 239 cattle and said 61 cattle were afterwards, and before the commencement of this suit, taken by Hall, Greer & Co. on their chattel mortgage from the farm of Daniel Hall, in Grundy county, and were by them, with the consent of Daniel Hall, and with the knowledge of one Stevens, agent of the plaintiff, put on board of cars for shipment to Chicago, for sale on the market in Chicago, and were by them transported to Chicago, and placed in the possession of the Union Stock-Yards & Transit Company, where they were when they were taken on the writ of replevin in this case.

The defendants also gave evidence to the effect that, of the said $5,000, there was appropriated enough to pay the debt owing by Daniel Hall to Keenan & Hancock; that there was left at the bank in Trenton, Mo., $1,287.75, to pay the debt of Hall Bros., of Kansas City, upon their delivering to and surrendering to the bank their note against Daniel Hall, and a release of the chattel mortgage to Hall Bros.; that Hall Bros. did not comply with the conditions on which the money was left at the bank, and did not obtain the money, and that on December 13, 1884, Hall, Greer & Co. withdrew such money from the bank; and that there remained unpaid, of the $5,000 secured by the chattel mortgage to Hall, Greer & Co., the sum of $3,753.92, with interest from December 13, 1884, at 10 per cent. per annum.

At the trial Hall, Greer & Co. offered to prove certain facts. The court heard the evidence in the absence of the jury, the question of its materiality being reserved. · Such evidence was to the effect that Daniel Hall, prior to the 6th day of September, 1884, and prior to the execution and delivery of the contracts, had negotiations with certain brokers or agents of the plaintiff (defendant in error) in regard to the purchase of the cattle from the plaintiff at the price of $35 per head, for a term of credit, and interest on the purchase price at 12 per cent. per annum from that time until the time to be agreed upon between the parties for the payment of the purchase price for the cattle; that the cattle described in the contract of September 6, 1884, were none of them delivered to Hall until after the execution of the contract, and were delivered to Hall under and in pursuance of the contract, and that when the contract was prepared the sum of $36.05, named therein, was arrived at by casting interest on the sum of $35 at 12 per cent. for the time to elapse between the date of the contract and the time specified in the contract for shipping the cattle, and that the declared purpose of the contract, at the time it was so made and delivered, was that the cattle company should retain the title to the cattle, and should sell the same, giving Hall the benefit of any increase in the market value of the cattle, by reason of the feeding, above $35 per head, and 12 per cent. per annum interest; and that the same state of facts existed in relation to the cattle described in the other two contracts, with the exception that the cattle described and mentioned in the two contracts dated October 1st and 16th, respectively, were actually delivered into the possession of Hall before the two contracts were signed. Thereupon the court decided that such evidence was not competent to be submitted to the jury; that the contracts must be held to be controlling and binding on the parties, as containing the whole transaction between them in relation to the cattle described therein, and refused to submit such evidence to the jury, or to permit the defendants to give evidence of any matters in relation to the negotiations between the parties in regard to the terms and conditions on which the cattle should be delivered to Hall, which were had before the contracts in writing were made; that the negotiations in regard to the proposed purchase of the cattle by Hall were between Hall and certain brokers of the plaintiff, who had no authority to make a sale of the cattle upon credit; and that when the proposition of Hall was submitted to Mr. Forbes, the manager of the plaintiff, he refused to make a sale to Hall on credit, but proposed to let Hall take the cattle on the terms of the contracts, and Hall acceded to the term so insisted upon by Forbes. To this ruling the defendants excepted.

The court directed a verdict for the plaintiff, to which ruling a proper exception was taken.

J. A. Sleeper, for plaintiffs in error.

Charles B. McCoy, (Charles E. Pope, of counsel,) for defendant in error.

Before WOODS and JENKINS, Circuit Judges, and BAKER, District Judge.

JENKINS, Circuit Judge, (after stating the facts.) If the contract constitutes a bailment of personal property, and Hall was an agister, the judgment is clearly right. If, on the other hand, the contract should be construed as a conditional sale of personal property, reserving title in the vendor until payment of the purchase price, then, by force of the statutes of Missouri, (Rev. St. c. 34, §§ 2505-2508,) the contract is void as to Hall, Greer & Co., who, for the purposes of this case, as presented to us, must be deemed purchasers for value, without notice of the rights of the cattle company. The purpose of that statute is to avoid, as against subsequent purchasers in good faith, and creditors, all secret liens upon personal property.

Hervey v. Locomotive Works, 93 U. S. 664; Fosdick v. Schall, 99 U. S. 235, 250; Harkness v. Russell, 118 U. S. 663, 7 Sup. Ct. 51; Coover v. Johnson, 86 Mo. 533; Peet v. Spencer, 90 Mo. 384, 2 S. W. 434.

The cause must therefore be determined by the construction to be placed upon the contracts under which possession of the cattle was delivered to Hall. In the solution of that question, we must search for the intention of the parties, as it may be gathered from a reading of the entire instrument, and not from any separate provision of it,—the real design of the contracting parties, as disclosed by the whole contract. We should not regard any mere formula of words, nor permit parties to avoid the statute by any cloaking of intent. If, as is asserted, the contract, as expressed, is a mere device to evade the law of Missouri, it undoubtedly becomes the duty of the court to tear away the mask, and declare the real nature of the transaction. The true intent and meaning of the contract does not depend upon "any name which the parties may have given to the instrument, and not alone on any particular provisions it contains, disconnected from all others, but on the ruling intentions of the parties, gathered from all the language they have used. It is the legal effect of the whole which is to be sought for. The form of the instrument is of little account." Heryford v. Davis, 102 U. S. 235, 243.

It is of the essence of a contract of sale that there should be a buyer and a seller; a price to be given and taken; an agreement to pay, and an agreement to receive. "Sale" is a word of precise legal import. "It means, at all times, a contract between parties to give and to pass rights of property for money, which the buyer pays, or promises to pay, to the seller, for the thing bought and sold." Williamson v. Berry, 8 How. 544. A conditional sale implies the delivery to the purchaser of the subject-matter, the title passing only upon the performance of a condition precedent, or becoming reinvested in the seller upon failure to perform a condition subsequent. It is not infrequently a matter of difficulty to accurately distinguish between a conditional sale and a bailment of property. The border line is somewhat obscure, at times. The difficulty must be solved by the ascertainment of the real intent of the contracting parties, as found in their agreement. There are, however, certain discriminating earmarks, so to speak, by which the two may be distinguished. It is an indelible incident to a bailment that the bailor may require restoration of the thing bailed. Insurance Co. v. Randell, L. R. 3 P. C. 101; Jones, Bailm., (3d Ed.) pp. 64, 102; 2 Kent, Comm. § 589. If the identical thing, either in its original or in an altered form, is to be returned, it is a bailment. Powder Co. v. Burkhardt, 97 U. S. 116; Sturm v. Boker, 150 U. S. 312, 14 Sup. Ct. 99. In a contract of sale there is this distinguishing test, common to an absolute and to a conditional sale: that there must be an agreement, expressed or implied, to pay the purchase price. In a bailment, if a bailment for hire, there must be payment for the use of the thing let or bailed. Heryford v. Davis, supra. If service is to be rendered the subject-matter of the bailment, there must be

compensation for the service, unless the bailment be a mandate.    In a contract of conditional sale the agreement to pay the purchase price may be masked so as to give it the appearance of an agreement to pay for use.    In such case the court must ascertain the real intention of the contracting parties from the whole agreement, read in the light of the surrounding circumstances.

We must therefore subject the provisions of the contracts in question to the tests declared, to ascertain the real design of the contracting parties; to determine whether, under them, the cattle were bailed, or conditionally sold.    Careful scrutiny of the agreements, in the light of legal principles, compels us to the conviction that they must be held to be contracts of bailment.    Their essential terms are within narrow compass.    Hall agreed to transport the cattle to his farm at his own expense, and there feed them, that they might be profitably marketed by the cattle company.    He covenanted that they should not deteriorate in flesh or condition. He bound himself to pay, at an agreed valuation, for all losses of ,the cattle arising from "death, disease, escape, theft, or any cause :whatever."    He was to employ at his own expense a herdsman selected by the cattle company.    The pasturage was to extend over a period of some 14 weeks, during which time the cattle company should ship the cattle to market, or sell them in pasturage.    Hall :was to receive, in full compensation for his services and expendi- ¦tures, all moneys realized from the sale of the cattle by the cattle ¦company in excess of $36.05 per head, after deducting the expenses 'of shipment and sale.    He also waived any lien upon the cattle for his own services.    There is wanting here an essential element of a 'sale,—an agreement to pay a price.    Hall took upon himself no obligation of that character.    He assumed no debt to the cattle company.    If the cattle, upon sale, should produce less than the stated amount per head above transportation and expense of sale, the loss would fall upon the cattle company, not upon Hall.    The latter took no risk of the market, except as it might affect his compensation for care and feed of the cattle during the period of pasture. The value of the cattle would depend largely upon their condition when exhibited in market.    That condition depended largely upon the character of their care and pasturage.    This being within the peculiar duty of Hall, it was wisely provided, to stimulate him to diligent care of the cattle, that compensation for his service should be contingent upon the amount realized upon sale.    So to that extent he took the risk of the market.    But if, by reason of a general depreciation in the value of cattle, the stated sum per head should not be realized, Hall would lose compensation for his service, and the cattle company would suffer the decrease in value.    So that each party assumed a hazard of the venture,—the one having at risk his property; the other, his compensation for service in the care of that property.    Hall was a mere agister, with compensation for service contingent upon the price obtained upon sale of the cattle.    He was under no obligation to purchase the cattle, nor to pay for them, nor did he warrant their market value.    We perceive no suggestion in the writings that any conditional sale of the cattle

to Hall was contemplated. In no event was he to be invested with the title. He was in fact, in any event, to return these cattle to the cattle company. The company, not Hall, had the power of disposition. The company, not Hall, was to select the time of sale and the market. The company, not Hall, was to transport the cattle to market; and while in transit, and thereafter while awaiting sale, the cattle were to be in the possession of, and at the risk of, the company.

It cannot be denied that one stipulation of the contract, considered by itself, gives countenance to the suggestion of a conditional sale. We refer to the provision that Hall should be liable "for all losses of said cattle arising from death, disease, escape, theft, or any cause whatever." Standing alone, this clause would be strong to show that Hall assumed the burden of ownership. It would be most unfair, however, to judge the contract by a single clause disconnected from the other stipulations contained in it. We must have regard to the entire agreement to determine the meaning of any part of it. It may well comport with a bailment of property that the bailee assumes the character of insurer of the thing bailed while it remains in his possession, and as to those disasters which he, by the exercise of care, could largely guard against, and which would be greatly promoted by his negligence. It is competent for a bailee so to enlarge his responsibility. Sturm v. Boker, 150 U. S. 312, 14 Sup. Ct. 99. Such a clause, read in connection with the other stipulations of the contract, may well be held a wise provision, imposing upon the bailee, in the care of the cattle while in his custody, the liability of an insurer, stimulating the exercise of care for them. Nor are we able to place upon the language employed the construction contended for, which would impose upon Hall accountability for depreciation in market value. We find no warrant for such suggestion. The provision is limited to the period that the cattle remain in Hall's care, not after the redelivery of them to the company, when and when only they were to be sold. The provision comprehends "losses of said cattle" only, not loss by depreciation in market value; and that loss must arise from "death, disease, escape, theft, or any cause whatever." "Noscitur a sociis." We cannot indulge a strained construction of the stipulation to qualify the clear intent of the agreement considered in its entirety.

It may be, as suggested by counsel, that Hall could pay to the cattle company the stated sum per head, and so obtain title to the cattle. That would result, because he was entitled, as reward for his service, to the proceeds of the cattle in excess of the stated sum per head. He possibly had that option, but was under no obligation to pay. There was no debt to discharge. There can be no sale without an agreement, express or implied, to pay. An option is not a sale, (Hunt v. Wyman, 100 Mass. 200,) and possession of property under an option to purchase, when that possession is delivered, for service to be rendered the thing bailed, will not transmute into a conditional sale that which is otherwise a bailment.

Nor are we able to discover in these contracts, read in the light of surrounding circumstances, any design to avoid the law of the

state of Missouri. The statutes which are claimed to avoid the contracts are these:

"Sec. 2505. * * * No sale of goods and chattels when possession is delivered to the vendee shall be subject to any condition whatever as against creditors of the vendee, or subsequent purchasers from such vendee in good faith, unless such condition shall be evidenced by writing, executed and acknowledged by the vendee and recorded as now provided in cases of mortgages of personal property." Laws 1877, p. 320, § 1; (f.)

"Sec. 2507. Conditional Sales, Void as to Creditors unless Recorded. In all cases where any personal property shall be sold to any person, to be paid for in whole or in part in installments or be leased, rented, hired, or delivered to another on condition that the same shall belong to the person purchasing, leasing, renting, hiring, or receiving the same whenever the amount paid shall be a certain sum, or the value of such property, the title of the same to remain in the vendor, lessor, renter, hirer, or deliverer of the same, until such sum or the value of such property or any part thereof shall have been paid, such condition, in regard to the title so remaining until such payment, shall be void as to all subsequent purchasers in good faith, and creditors, unless such condition shall be evidenced by writing executed, acknowledged and recorded, as provided in cases of mortgages of personal property." Laws 1877, p. 321, § 1.

"Sec. 2508. Duty of Vendor, before Taking Possession of Property. Whenever such property is so sold or leased, rented, hired, or delivered, it shall be unlawful for the vendor, lessor, renter, hirer, or deliverer, or his or their agent or servant, to take possession of said property without tendering or refunding to the purchaser, lessee, renter, or hirer thereof, or any party receiving the same, the sum or sums of money so paid, after deducting therefrom a reasonable compensation for the use of such property, which shall in no case exceed twenty-five per cent. of the amount so paid, anything in the contract to the contrary notwithstanding, and whether such condition be expressed in such contract or not, unless such property has been broken or actually damaged, and then a reasonable compensation for such breakage or damage shall be allowed." Laws 1877, p. 321, § 2.

It is to be observed that the statute is directed to sales, not to bailments, of property. It sought to prevent, as against purchasers and creditors, the sale, leasing, hiring, or delivery of goods on condition that the title should pass on payment of the price or value of the property. Peet v. Spencer, 90 Mo. 384, 2 S. W. 434. It was aimed at such transactions as were under consideration in the cases to which we are referred, (Hervey v. Locomotive Works, 93 U. S. 664; Heryford v. Davis, 102 U. S. 235; Sumner v. Cottey, 71 Mo. 121; Whitcomb v. Woodworth, 54 Vt. 544; Hiné v. Roberts, 48 Conn. 267; Stadtfeld v. Huntsman, 92 Pa. St. 53; Greer v. Church, 13 Bush, 430; Murch v. Wright, 46 Ill. 487; Lucas v. Campbell, 88 Ill. 447,) and others of that class, where an undoubted sale of property was thinly disguised under the mask of a lease, and the purchase price cloaked under the guise of rent. In all these cases there was the absolute undertaking of the vendee to pay the price, and there was the manifest intention to vest the title in the purchaser upon payment. But here there is no suggestion in the writing that the title should ever pass to Hall; the cattle were to be returned by him, and sold by the cattle company. There was no obligation on his part to pay any sum as the price of the cattle, or for their use. He was merely to fatten the cattle, and receive for their pasturage, and the care bestowed upon them, the amount over and above a stated sum per head, if the cattle company should realize so much upon

their sale in the market.   Without further enlarging upon the subject, we are satisfied that the agreement was a bailment, not a conditional sale, and is not within the condemnation of the statute.

With respect to the ruling upon evidence offered at the trial, and rejected by the court, we think the ruling correct.   It is elementary that in the absence of fraud, accident, or mistake, parol evidence of prior negotiations should not be allowed to contradict the terms of a written agreement.   The written agreement speaks conclusively the conclusion to which the parties to it have arrived, and all prior negotiations are merged in it.   Willard v. Tayloe, 8 Wall. 557; Forsyth v. Kimball, 91 U. S. 291; Bast v. Bank, 101 U. S. 93, 96.   Resort may be had to proof of the circumstances out of which the contract grew, and which surrounded its adoption, to ascertain its subject-matter, and the standpoint of the parties in relation to it, but not to vary the contract by addition or substitution.   Mr. Greenleaf thus announces the rule:

"The writing, it is true, may be read by the light of surrounding circumstances, in order to understand the intent and meaning of the parties; but, as they have constituted the writing to be the only outward and visible expression of their meaning, no other words are to be added to it, or substituted in its stead.   The duty of the courts, in such cases, is to ascertain, not what the parties may have secretly intended, as contradistinguished from what their words express, but what is the meaning of the words they have used.   It is merely a duty of interpretation (that is, to find out the true sense of the written words, as the parties used them) and of construction, (that is, when the true sense is ascertained, to subject the instrument, in its interpretation, to the established rules of law.)   And, when the language of an instrument has a settled legal construction, parol evidence is not admissible to contradict that construction."   Greenl. Ev. § 277.

But resort to surrounding circumstances is not allowed, for the purpose of adding a new and distinct undertaking, Maryland v. Railroad Co., 22 Wall. 105.   The circumstances surrounding the making of a contract is one thing.   The parol negotiations leading up to the written agreement is another and a different thing.   Parol evidence may be received of the existence of an independent oral agreement, not inconsistent with the stipulations of the written contract, in respect to a matter to which the writing does not speak, but not to contradict the contract.   The cases of Machine Co. v. Anderson, 23 Minn. 57, and Machine Co. v. Holcomb, 40 Iowa, 33, which are urged upon our attention, if in opposition to the rule stated, cannot be followed.   The one case is rested upon the ground that the sale and delivery were absolute and complete before the written instrument, and that the subsequent lease was repugnant to the contract of absolute sale, and void for want of consideration.   In the latter case it was held that the writing did not contain the whole contract.   It is unnecessary to consider whether those cases can be upheld.   We do not consider them relevant here, for the reason that the evidence offered does not bring the matter here within the cases cited.   The offer here, and the evidence adduced to the court thereunder, was only to the effect that Hall, previous to the contracts, had negotiations with certain agents of the

cattle company to purchase the cattle on credit. There is, however, no suggestion that the company agreed to sell upon credit; and if we may rest upon the statement of the trial judge in his opinion, the evidence not being preserved in the bill of exceptions, the agent of the company refused to sell to Hall upon credit, or to take chattel mortgage security upon the cattle, but was willing to intrust them to Hall under a feeding contract, and upon the terms stated in the writing. The offer of evidence expressly states that none of the cattle were delivered into the possession of Hall before execution and delivery of the contract of September 6, 1884, and were delivered under and in pursuance of the contract. This would seem to conclude the contention, and demonstrates that the writing speaks the actual and entire contract.

The further offer to prove "that the declared purpose of said contract, at the time it was so made and delivered, was that the cattle company should retain the title to said cattle, and should sell the same, giving Hall the benefit of any increase in the value of the cattle by reason of the feeding, in the market, above $35 per head and twelve per cent. per annum interest," would throw no light upon the intention of the contracting parties, if it were admissible. The contract itself so speaks, giving the increase to Hall for his services as agister.

The judgment must be affirmed.