STATE v. THE COLONIAL CLUB.

(Filed 14 December, 1910.)

1. Spirituous Liquors—Penalty Statutes—Construction.

   The statute prohibiting the sale of spirituous, etc., liquors is a
   penal one, strictly to be construed, and the meaning of the words
   employed of "precise legal import, both at law and in equity,"
   will not be extended to include an unexpressed but presumed in-
   tention of the Legislature.

2. Same—"Sale"—Intent.

   The words "sale" or "sell," used in the general prohibition law,
   have a well-known legal signification, and in the absence of any-
   thing to the contrary appearing in the statute, that signification
   is assumed to be the one intended.

3. Same—Consideration.

   In order to constitute a sale within the meaning of the general
   prohibition law, there must be a transfer upon a valuable con-
   sideration of the absolute or general property in the spirituous
   liquor alleged to have been sold contrary to law.

4. Same—Interpretation of Statutes—Gratuitous Bailee—Comming-
   ling of Goods—Principal and Agent—Special Verdict—Intent.

   Upon the trial of the defendant club for the sale of spirituous
   liquor contrary to the general prohibition law, it appears by spe-
   cial verdict that, under an existing arrangement for all members,
   one of its members made an order for beer in bottles on a dealer
   beyond the State, directing that it be shipped to him in care of
   the defendant, handing the steward of the club the amount of the
   order in money, and which the club remitted the dealer by its
   check on its bank account. The beer was received by the man-
   ager of the club and commingled with the bottled beer of other
   members, and furnished to the member according to a general
   system of checking used by the club, until the number of bottles
   ordered was gone. The club did not solicit these orders: *Held,*
   (1) under this arrangement the title to the beer did not vest in
   the club; (2) ordering the beer from beyond the State was not
   an illegal act, the club acting as the agent of the member and the
   title to the beer did not vest in the club (Rev., sec. 3534); (3)
   the club rendering the service without compensation was a gra-
   tuitous bailee, having only a qualified interest, and the fact
   that the bottles of beer of one member were commingled with
   those of the others kept by the club as such, did not render the
   transaction a sale; (4) the facts in this case did not constitute

154—12

the club the agent of the vendor in another State; (5) as the special verdict did not find the intent, its existence may not be presumed by the court.

CLARK, C. J., and HOKE, J., dissenting.

APPEAL from *Long, J.,* at September Term, 1910, of MECKLENBURG.

The indictment of defendant contains three counts, to wit:

*First Count.* That the defendant solicited orders for intoxicating liquors within the borders of Mecklenburg County, contrary to law.

*Second Count.* That the defendant sold and retailed spirituous and malt liquors to some person to the jurors unknown.

*Third Count.* That the defendant kept on hand for sale more than 2½ gallons of spirituous liquors in the county of Mecklenburg, contrary to law.

The defendant pleaded not guilty. The jury rendered the following special verdict:

"The Colonial Club is a corporation duly created and organized under the laws of the State of North Carolina, the charter of said club being dated 22 June, 1904, a copy of which charter is hereto attached, and a copy of the by-laws of the said club is hereto attached; that said club has its club-rooms in a commodious building at the corner of North Tryon and East Fifth streets, in the city of Charlotte, N. C. There are 180 members of said club; the initiation fee is $10 and the quarterly dues $6; nobody but men can join the club, and they must be over 21 years of age. That said club has a manager who stays at said club-rooms most all his time, and also has a president and board of directors and treasurer. That said club keeps on hand a book, with order blanks for lager-beer, a copy of which is hereto attached. The order blank has a stub and corresponds with the number on the order; said stub is kept by the club, and when an order is made a memorandum is made on the same number as the order blank is on the stub, showing substantially the same as on the order blank, a copy of which stub is hereto attached. These books, with the order blanks, are paid for by the club, but no officer of the club actually solicits a member to make the

order. When the order is made by the member of the club, the money for the order is given to the manager of the club, and the manager turns the money over to the treasurer of the club. The treasurer of the club has a banking account, in which he banks the money received by him and sends the order on the liquor house, with the check of the club for the amount received from the member, and the liquor is sent to the member in care of the club; that the club makes no charges to the members and gets no profits out of the transaction. That at the time the beer was received by the club (if the order was for beer), the manager would give the member a book, with the same number on it as was on the order blank and on the stub, and if the order was for 12 dozen bottles of beer, the book would contain 12 dozen separate coupons. A copy of the kind of book issued is hereto attached. That the manager of the club kept and keeps a system of refrigerators, in which all the beers are mixed with beer of other members of the club. If the club member wants a bottle of beer for himself and a friend, he hands the book, a copy of which is hereto attached, to the steward of the club, who would tear out as many coupons as bottles of beer ordered, and deliver to such member the number of such bottles of beer ordered, getting them out of the refrigerators where it was mixed with the other beer of the other members of the club. That the liquor ordered by this club is only beer, and orders were sent out of the State of North Carolina. That this system of ordering and delivering lager-beer was at times hereinafter mentioned and at the time of finding this indictment carried on at the club's rooms in the city of Charlotte by its manager and treasurer, under the directions of said club. That following these regulations of the club, one of its members, a person to the jurors unknown, went to the club-rooms in the city of Charlotte, on the .... day of .........., 1910, paid the club's manager the sum of $8.50 and asked the manager to fill out one of the order blanks for 10 dozen pint bottles of lager-beer and forward same to a liquor house (a person to the jurors unknown) in Richmond, Va., to be filled, which was done accord-

ingly, and the club's check was also sent to the liquor house for the amount of the order, and the said beer was shipped by the liquor house to the member in Charlotte in care of the club, arriving on the .... day of .........., 1910, was at once taken charge of by the manager and put in the refrigerators and mingled with the beer of other members, and on the same day and for some days thereafter said club manager delivered bottles of lager-beer to said member out of the club's refrigerators, received from said member beer coupons in accordance with the club's regulations, and on until the member had received 10 dozen pint bottles of lager-beer as a beverage, all of which was willfully done in the city of Charlotte in prohibition territory; neither the club nor its manager having at any time any license to sell lager-beer, and that said club was not the agent of said liquor house from whom the beer was ordered any further than the foregoing facts may.as a matter of law make it the agent, and that the club received no profit for its connection with the transaction.

"The jury for their special verdict say:

"We find the foregoing facts; and if on said facts the court is of the opinion that the defendant is guilty, then we find the defendant guilty as charged in the bill; and if the court be of the opinion that the defendant is not guilty upon such findings, then we find the defendant not guilty."

The following is a copy of the ticket given to the member upon receipt at the club of the beer:

> Bohemian.
> C. C. No. 16798.
> Deliver one of the lot held for me.
> No. ..........

And the following is the copy of the order blank referred to in the special verdict:

> No. 3369.
> To ...........................................
> Order ........................................
> Ordered by ..................................

No. 3369, Charlotte, N. C., ............... ....19....
Mess. ........................................
　　Gentlemen : Please ship me by ι ....... as follows :

........................................
Ship care The Colonial Club.　　　Yours truly,

.....................

Upon the special verdict the court adjudged the defendant guilty, and imposed a fine of $500, and from its judgment the defendant appealed.

*Attorney-General Bickett, George L. Jones, and Clarkson & Duls for the State.*

*Cameron Morrison for defendant.*

Manning, J. Chapter 71, Public Laws of 1908, the State-wide prohibition act, having been approved by a majority of the voters of the State at the special election held therefor, it is now unlawful for any person or persons, firm or corporation, to manufacture or in any manner make or sell or otherwise dispose of for gain, at any place within the State, any spirituous, vinous, fermented or malt liquors or intoxicating bitters.

In the disposition of this appeal we are not concerned with the manufacture or in any manner the making of the prohibited liquors. The special verdict presents the question whether the facts found constitute a sale by the defendant or an otherwise disposition of the beer for gain. The words "sale" or "sell" have a well-known legal signification, and in the absence of anything to the contrary appearing in the statute, we must assume that they were here intended to have that signification. This is a generally accepted rule of statutory construction. Black on Intoxicating Liquors, secs. 403, 406; *Patterson v. Galliher,* 122 N. C., 511; *Adams v. Turrentine,* 30 N. C., 147; *S. v. Gupton,* 30 N. C., 271; *S. v. Barco,* 150 N. C., 792; 36 Cyc., 1114. The word sale is thus defined: "A sale is a transmutation of property from one man to another in consideration of some price or recompense in value." 2 Blk. Com., 446. "It is a transfer of the absolute or general property in a thing for a price in money." Benj. Sales, sec. 1. "A sale is the passing of the title and possession of any property for money which the

buyer pays or promises to pay." *Konavek v. State,* 38 Tex. Crim. Rep., 44, 41 S. W., 612; *S. v. Law and Order Club* (Ill.), 62 L. R. A., 884; 7 Words and Phrases Judicially Defined, 6291 and 6292. In *S. v. McMinn,* 83 N. C., 668, an indictment for retailing without license, *Judge Dillard,* speaking for this Court, said: "A sale is the transmutation of the property in a personal chattel from one to another on a *quid pro quo,* paid or agreed to be paid, and such a change of property in the retail of spirituous liquors by the small measure is usually effected by the delivery of the article and the payment of the price simultaneously; but it may be made in other modes. . . . To constitute a sale under the statute against retailing, there is no necessity for a manual separation and delivery of the parcel by the retailer to the customer, but it will be a delivery sufficient in law if the keg, decanter, or other vessel be so placed or prepared as that the customers can or may, with the consent of the owner, draw for himself; and so, likewise, the price paid in completing the sale need not be paid into the hands of the proprietor, but it will be equivalent if it be deposited for him in a place of his appointment." *S. v. Kirkham,* 23 N. C., 384; *S. v. Bell,* 47 N. C., 337; *S. v. Simmons,* 66 N. C., 622; *S. v. Poteet,* 86 N. C., 612; *S. v. Taylor,* 89 N. C., 577; 1 Mechem on Sales, sec. 1. This learned writer says in section 1: "The essential elements here involved are that there must be (1) a transfer, of (2) the general or absolute title, to (3) a specific chattel, for (4) a price in money or a consideration estimated in money. Sale is preëminently the transfer of the title." Again: "Sale means, moreover, the transfer of the absolute or general title. There may be other transfers, of limited interests, such as the right of possession or some specific property in or lien upon the goods; but these, as will be seen, do not constitute a sale." So that, to constitute a sale, it being necessary that the facts found should prove a transfer of the absolute or general property in the chattel, we think they fail in this case to show this essential element; and we think, also, there was an entire failure to show that the transfer was for any consideration whatever, presently delivered or promised. If there was no general or absolute property in the beer transferred to the defendant, there was no transmutation of title. Nor was it the agency selected

to work a change of title. We must have due regard to the fact that we are construing a penal statute and the rule of strict construction applicable to such statutes; nor do we feel warranted in extending the meaning of a word of "precise legal import, both at law and in equity," to reach an unexpressed but presumed intention of the Legislature. The defendant, as the depository of the beer ordered by the member of the club unknown to the jurors, who ordered the beer and had it delivered in his name and for his use to the defendant, was acting solely as the servant, agent, or bailee without hire for such member. The member made the order in his own name, specified the quality and quantity, directed it to be shipped to him in care of the defendant; the firm or person to whom the order was sent lived beyond the State; the beer was shipped as directed, addressed to the person ordering it at Charlotte, and was delivered as directed, at defendant's club-house. When or how did the title become vested in the defendant? What right of property did it have in it, and when and by what act? The delivery to defendant for the person ordering and in his name could certainly vest in it no right of property. Could any creditor of the club have seized it under execution, as the property of the club? If so, when did the ownership and title of the person who ordered it, paid for it, and to whom it was shipped, cease, and by what process known to the law was there a transmutation of his title? "The laws of this State have thus far not made the purchase of whiskey a criminal offense, when it is bought by the purchaser himself and for his own use. To bring one who procures whiskey for another under this statute (section 3534, Revisal) it will be noted that the sale by which it was procured must be illegal, and the law does not apply to cases where the sale is not illegal, or where our State legislation on the subject cannot apply to and affect the transaction. Such cases are not within the purview of the section referred to, Revisal, sec. 3534, but, as to them, the general doctrine obtains, that in sale of whiskey, where one acts entirely as agent of the buyer, having no interest in the whiskey, and taking no part in the sale as vendor, nor as his agent or employee, such

person is not indictable under the laws controlling the subject, as they now stand. *S. v. Smith,* 117 N. C., 809." *S. v. Whisenant,* 149 N. C., 515.

The *rationale* of this decision is obvious; my own agent is not a vendor to me when he executes my order to buy as I direct, and delivers the property so authorized to be bought to me; he is but my representative, there is no sale by him to me. The mere forwarding its member's money by its own check to the nonresident vendor was not an illegal act, nor did it vest the title to the beer in the defendant. In *Lockyear's case,* 95 N. C., 633, the liquor furnished the members of the club (a corporation duly organized under the laws of this State) was purchased by and in the name of the corporation; the title to it was in the corporation, and when the corporation transferred any of it to a member or stockholder, every element essential to constitute a sale was present. While, ordinarily, to constitute a sale (as in the case of every simple contract) a consideration is necessary, the facts determinative of the transaction as a sale do not depend upon the adequacy of the consideration, and the fact, as in the *Lockyear case,* that the liquor was furnished at cost did not relieve the transaction from being a sale. So in *Neis' case,* 108 N. C., 787, a case resembling, but upon the facts easily distinguishable from, the present case, the defendant (as steward of the club) held the liquors for the several members, not in separate jugs or other vessels for each, but commingled in the same jugs and vessels, and received from each member the price of the liquor delivered to him as he wished at the rate of 10 cents per drink, and with the money so paid him he replenished the stock with other liquors and sold of them indiscriminately to the contributing members at the stated price. It is clear, therefore, that the purchasing member did not have the sole property in the whiskey delivered to him, and that the sum paid was the price, at least, of the interest of the others in it, and that the defendant was the agent authorized to make the sale and receive the price; and this being done in territory where a sale was prohibited, it was violation of law. So this Court said: "Before the transaction, the money was solely his and the liquor belonged to several.

By virtue of the transaction, and in exchange for the money, the liquor became his sole and separate property. This is surely a sale. It has every element of a sale."

In *S. v. Bell,* 47 N. C., 337, the Court, in defining what constituted a sale by the small measure under the statute prohibiting the retailing of spirituous liquors "by the small measure, that is to say, in quantities less than a quart, without license," said: "In the case of *S. v. Kirkham,* 23 N. C., 384, the Court said if the contract between the parties had been that the seller should deliver a quart of spirits, *which particular quart* should thereupon become the property of the purchaser, although the seller, by agreement, was to retain it *for the purchaser,* so as to be used by the latter, from time to time, as he might require, we suppose that such a contract (unless, perhaps, it were found by the jury that there was an intent thereby to evade the statute) must have been held to be a contract for the sale of a quart. In the case now under consideration the particular quart became the property of the purchaser upon the price being paid; it was placed in a decanter separate from the rest of the spirits, to be used by the purchaser at his pleasure, and he might at any time have taken away the whole without the consent of the seller, and either carried it home or deposited it elsewhere."

So in the present case we think it was competent for the particular member of the club referred to in the special verdict to have taken away the bottles of beer ordered and received by him, and either carried them home or deposited them elsewhere. It was in separate bottles from that ordered by others, and it may have been of a different brand or even of the same brand. We think the facts found in the special verdict expressly negative an intent to evade the statute, unless the facts themselves, as found therein, independent of any actual intent, determine the guilt of the defendant.

It must be further observed, in the consideration of this case, that we are dealing with a special verdict and not a general verdict. In the case of a special verdict we have held that "The Court is confined to the facts found, and is not at liberty to infer anything not directly found." *S. v. McCloud,* 151 N. C., 730; *S. v. Custer,* 65 N. C., 339; *S. v. Hanner,* 143 N. C., 632.

In the case of a general verdict of guilty, many presumptions arise which do not in a special verdict. If intent is a necessary element of the crime, and a special verdict is rendered which does not find the intent, this Court cannot presume its existence. In any case, the trial judge may decline to receive a special verdict, and insist that the jury return a general verdict of guilty or not guilty; but when a special verdict is found by the jury, neither the trial court nor the appellate court can add any fact not directly found, nor can its existence be presumed. The special verdict, however, finds that the beer shipped to the unknown member in the care of the defendant was, after delivery at defendant's club-house, "at once taken charge of by the manager and put in the refrigerators and mingled with the beer of other members, and on the same day and for some days thereafter said club manager delivered bottles of lager-beer to said member out of the club's refrigerators," until the member had exhausted the number of bottles ordered by him; and the learned counsel for the State earnestly contend that this commingling or voluntary confusion by the defendant of the several bottles of beer ordered by any two or more of its members transmuted the title of all of it to the defendant, and constitutes a subsequent delivery of it to any such member a *sale* by the defendant, and, therefore, a violation of the statute. It will be noted that the special verdict finds other facts pertinent to this contention, to wit, that the member who ordered the 10 dozen pint bottles of a particular brand of beer received that number of the brand when and as he desired; that beer coupons were issued to him showing the quantity and brand ordered; that when the quantity ordered by him and delivered to defendant was exhausted, he could get no more; and that the beer coupons were used as a check to prevent the member from overdrinking his beer. There was no agreement or understanding that the member was to be paid for any shortage, or that the defendant had any power of substitution or any right of disposal except as called for by the member who delivered it to the club. There was no storage charge or charge of any kind made or received by defendant for its service, nor any gain or profit of any kind or nature to it in the transaction, nor, if a sale, any

consideration, however small, to support the transaction as a sale. It was wholly a gratuitous service. No consideration was paid the defendant, none promised it; the member drank the quantity and quality of beer as ordered by him, and no more. The defendant received nothing. A simple illustration will serve to present this contention. A, B, C, and D, each owning a Berkshire pig 4 months old, severally take them to their common friend, Farmer Jones, for his care and oversight. Farmer Jones, without charge and solely for the accommodation of his friends, accepts the pigs, and, having but one pen, he puts each pig into that pen as he is brought. His friends know this will be done. When A calls for his pig, suppose Farmer Jones should say to him: "A sale has been made to me by you of the pig." And if he were to deliver the pig to A, upon his persistent 'denial of a sale, he would say: "I now sell him to you again." We may well imagine the astonishment of both A and Farmer Jones; the former that a bailment solely for his benefit had been by act of the law, and contrary to the intention of the parties, without price received or even promised, converted into a sale; and the latter, Farmer Jones, that he had become the owner of property he did not intend to own, by the mere accommodating service rendered to his friends; and if a statute prohibited the sale of pigs by any person without a license therefor, that he had violated the criminal laws of the State. In our opinion, the transaction between the defendant club and its members was like unto this. *Union Stock Yards v. Western Land Co.,* 59 Fed., 49. It was a gratuitous bailment, solely for benefit of the member of defendant club—a *depositum* (Story on Bailment, sec. 41)—and no title was transferred to the bailee as against the bailor, for it is a generally accepted doctrine, "stated broadly and without any qualification, that a bailee may not, in any case, dispute or deny the title of the bailor." 5 Cyc., 172. The same doctrine has been declared by this Court. *Maxwell v. Houston,* 67 N. C., 305.

The special property or possessory interest of the bailee is thus stated in 5 Cyc., 171: "The bailee has, by virtue of the bailment and until its termination, a special property or possessory interest in the subject-matter which entitles him, what-

ever be the class of the bailment, to avail himself of any legal means *to defend it against any person who may interfere with his accomplishing the purposes of the bailment." Hopper v. Miller,* 76 N. C., 402.

The effect of the commingling or confusion of property is illustrated by the decisions of the courts in the grain elevator or warehouse cases and is considered in the authorities. These cases establish the doctrine that, being a bailment when the grain is received, the transaction is not converted into a sale unless by special provisions of the contract. 1 Mechem on Sales, secs. 24, 25, 26. In *Woodward v. Seemans* (1890), 125 Ind., 330, the Court said: "It is the law of this jurisdiction, as well as of many others, that where a warehouseman receives grain on deposit for the owner, to be commingled with other grain in a common receptacle from which sales are made, the warehouseman keeping constantly on hand grain of like kind and quality for the depositor, and ready for delivery to him on call, the contract is one of bailment and not of sale." In *Rice v. Nixon,* 97 Ind., 97, the Court said: "There are cases in which a bailee is responsible for the loss of goods where he commingles *them with his own,* but this principle does not apply where a warehouseman receives grain to be stored for the owner. Articles of such a character can be separated by measurement, and no injury result to the owner from the act of the warehouseman in mingling them with like articles of his own. . . . There is, however, as shown by the cases cited, some conflict of opinion, but, as said in a late work, the great weight of authority is that the contract is one of bailment and not of sale, the warehouseman and the depositor becoming owners as tenants in common. Law of Prod. Ex., sec. 154, Auth. N. Q." And the Court further said: "If the warehouseman is not bound to place grain in a separate place for each depositor, then the fact that he puts it in a common receptacle with grain of his own and that of other depositors does not make him a purchaser; and if he is not a purchaser, then he is a bailee. In all matters of contract the intention of the parties gives character and effect to the transaction, and in such a case as this the circumstances declare that the intention was to make a contract of bailment

and not a contract of sale." Story on Bailment, sec. 40; Van Zile Bailments and Carriers, secs. 3, 5, 6, 7, and 8; *Coggs v. Bernard,* 2 Lord Raym., 912; *Bretz v. Diehl,* 117 Pa. St., 589; 2 Am. St., 706, and note by the editor, Judge Freeman; *Nelson v. Brown,* 44 Iowa, 455; *Irons v. Kentner,* 51 Iowa, 88, 33 Am. Rep., 119. In *Sturm v. Boker,* 150 U. S., 312, the Court said: *"The agency to sell and return the proceeds,* or the specific goods if not sold, stands precisely upon the same footing, and does not involve a change of title. An essential incident to trust property is that the trustee or bailee can never make use of it for his own benefit, nor can it be subjected by his creditors to the payment of his debts."

Applying, therefore, these settled doctrines of the law to the facts found in the special verdict, we are of the opinion that his Honor should have adjudged the defendant not guilty. The special verdict expressly finds that the defendant did not solicit or procure orders for beer—the only prohibited liquor order— nor was it the agent of the vendors (who lived beyond the State), and it is, therefore, not guilty under either section 2080 or 3534. *S. v. Johnston,* 139 N. C., 640; *S. v. Whisenant, supra; S. v. Burchfield,* 149 N. C., 537. The judgment is, therefore,

Reversed.

CLARK, C. J., dissenting: When the 180 members of this club made each his deposit for the purchase of liquor it went into the general fund of the club, and the money became the property of the club. In just the same way, when the depositors make general deposits in a bank, the money becomes the property of the bank, and the depositors become merely creditors of the bank to the amount of their deposits, for which they may draw. So when the defendant club received the liquors, purchased with the money of the depositors, and placed it, not on special deposit, but mingled together, such liquor became the property of the club. It is true, the lager-beer was not mingled with the champagne and the wine was not mixed with the whiskey, but all the liquors of each kind were mingled together. That is, each was received on general deposit, not on special deposit. When an order for beer was filled, it is agreed that it

was not filled by delivering to a member the identical beer which he had ordered, but it was filled out of the general stock of that particular brand or drink.

It is found as a fact that "When an order is given by a member of the club, the money for the order is given to the manager of the club, and the manager turns the money over to the treasurer of the club. The treasurer of the club has a banking account, in which he banks the money received by him and sends the order on the liquor house, with the check of the club for the amount received from the member." It is true, it is further found that "The liquor is sent to the member in care of the club." But the true nature of the transaction is found by the next paragraph: "At the time the beer was received by the club (if the order was for beer), the manager would give the member a book, with the same number on it as was on the order blank and on the stub, and if the order was for 12 dozen bottles, the book would contain 12 dozen separate coupons. The manager of the club kept and keeps a system of refrigerators, in which *all the beers are mixed with the beer of other members of the club.* If the club member wants a bottle of beer for himself and a friend, he hands the book to the steward of the club, who would tear out as many coupons as bottles of beer ordered, and deliver to such member the number of such bottles of beer ordered, getting them out of the refrigerators where it was mixed with the other beer of the other members of the club."

Looking through all disguises, as the law must do in all cases, the true nature of this transaction is simply this: the members of this club pay in (besides the $10 initiation fee and $24 yearly dues) whatever sum each thinks proper to furnish funds with which to buy beer. Such fund becomes the property of the club, just as in case of general deposits in the bank. The club then sends its check for the amount of beer each member orders. It is true, the beer is sent in the name of each member, but to the care of the club. It is received by the club, and not segregated and placed on special deposit for each member, but it is all mingled together. The beer thereupon becomes the property of the club, just as general deposits in the bank. Thereupon,

each member can check on the club from time to time and re-
ceive, not his own particular beer, but the quantity of beer he
desires, for which he pays with his coupons, just exactly as a
depositor checks money out of a bank. The bank owes the de-
positor so much money, and when it pays his check it does so
with its own money. So, here, each member of the club has a
general deposit entitling him to so many dollars' worth of beer.
He has paid for it beforehand with the money he has deposited,
and when he orders beer he cashes in his "coupons" exactly as a
gambler cashes in his "chips." It cannot be said that he does
not pay the club for the beer because he pays for it with a
coupon. The coupons represent the cash he has on deposit, and
when he pays for the beer with a coupon the coupon delivered
up for that amount diminishes the cash credit which he has.
The beer which he receives belongs to the club. It is true that
a certain quantity of beer was shipped in his name, but it was
shipped in the care of the club, received by it, and mixed with
its other goods, and became the club's property, subject to draft.
The use of the member's name as consignee was merely colora-
ble, not changing the nature of the transaction, and at most it
was like a check payable to a depositor, which he indorses and
deposits in a bank. The bank places the proceeds to the credit
of the depositor, but it becomes the property of the bank, which
simply owes the depositor a debt payable in money, as here the
club owes the member so many dollars' worth of beer, evidenced
by coupons with which he can buy so much beer from time
to time or, if he chooses, get the difference in money.

This is not the case of four farmers depositing four pigs.
That is a special deposit, or bailment, and each man gets back
his identical pig. Here, the member gets so many dollars' worth
of coupons which he pays for beer from time to time, as he calls
for it. He does not get his identical beer. He has none there.
He gets the beer of the club. If the beer is stolen, it must be
charged in a bill of indictment as the property of the club, just
as when money is stolen from a bank it must be charged as the
property of the bank, and not of the depositors. If an execu-
tion were issued against the club, it could be levied upon the

beer, as its property. It would make no difference that there were outstanding coupons of the club which it had promised to receive when tendered in payment for beer.

Looking at the transaction as it really is, this is simply a *Coöperative Bar-room.* Instead of the barkeeper getting his pay out of the profits of his sales, he is paid a salary by the club. Instead of the members going up to the bar and laying down their cash and receiving liquor in exchange, they simply raise the sum necessary to keep up a stock of liquors, each man paying in advance what amount he thinks proper, the liquor being shipped in his name, but received by the club and mingled with the common stock. Instead of each customer paying cash at the time, he has simply paid in advance, receiving therefor coupons which "he cashes in" for liquor. It is not necessary that to make a sale there shall be any profit. Many sales are made at a loss. The sale is made when the club delivers the quantity of liquor ordered and receives in exchange its coupons which represent that amount of the indebtedness it owes to the member by reason of his cash deposit. The coupons represent an indebtedness of the club, and therefore are of value. This strongly resembles the laundry "system," in which one buys a book of coupons and pays for his washing (instead of his drinks) by tearing coupons out of the book.

There is every element of a sale. The defendant is therefore guilty on the second count for retailing spirituous liquors. It is also guilty on the third count, for it has "kept on hand for sale more than 2½ gallons of spirituous liquors contrary to law." It is even guilty on the first count, for its whole system, with its sumptuous quarters and its refrigerating system of keeping liquors on ice, is a standing bid or solicitation to those who have the requisite means and gentility to apply for liquors which cannot otherwise be obtained elsewhere, always cool and enticing, without risk. That the liquor belongs to the club is further shown by the fact that the icing, the refrigerating, the service, and the manager are all paid for out of the general funds of the club, that stores, ices, and dispenses the liquor.

The membership of this club is doubtless exclusive. They are gentlemen of means and position. They wish to obtain "a

cold bottle and a hot bird" without the vulgarity of violating the law through the medium of a blind tiger. Besides, blind tigers are not furnished with refrigerators. It would give too much publicity. Among the members of this club are many gentlemen, doubtless, who are personal friends of each and every member of this Court. It seems a hardship to interfere with their pleasant arrangement to obtain cool drinks, on tap. There are many other features of the club than this, and to them no objections are raised; but their "coöperative bar-room Annex" is illegal. These gentlemen, however, are not on trial. What is on trial is the "system" which some ingenious and brilliant member of the bar (legal) has devised to "get by the judge." Somewhat similar "systems" were held invalid in *S. v. Neis,* 108 N. C., 787, and *S. v. Lockyear,* 95 N. C., 633. The author of this system has endeavored to avoid the features which were pointed out as most flagrant in those cases. But no device, however ingenious, can conceal the true nature of the transaction, which makes the manager of a social club a barkeeper on wages and which exchanges drinks or bottles against coupons which have been issued to members as evidence of a cash deposit.

Much has been said against prohibition as an unwarranted interference with the personal liberty of the citizen. And much has been said in favor of the duty of the State to repress the sale of liquor as a fruitful cause of drunkenness and crime. If so, it is none the less dangerous that the appetite for liquor is acquired, or maintained, in sumptuous club-houses and among respectable and wealthy men, who obtain their liquor duly cooled and handsomely served. Indeed, many young men will acquire the habit there who would not enter the purlieus of a corner groggery. Whatever the arguments for or against prohibition, the Court has no concern with them. The prohibition law was passed by the Legislature, representing the people. Having some doubt, possibly, as to their having truly expressed the will of their constituents, they sent the matter to the ballot box, by a *Referendum,* which, perhaps, should always be done in case of doubt, if the matter is of sufficient importance. On such ref-

erendum the people of this State settled the matter by a vote of 44,000 majority. The public policy thus declared should be enforced against all alike, without discrimination or exemption. If the "system" here invoked is valid, any number of men can chip in and buy a stock of liquors, issue coupons receivable as cash, in payment of drinks, and appoint one of their number "dealer," and settle up every now and then by comparing cash paid in and liquor consumed by each. The case is stronger against this defendant, for it is incorporated—a distinct entity.

The French have a maxim, *"noblesse oblige,"* which means that those in comfortable circumstances and possessed of means should set the example of obedience to the laws.

Devices to evade the law have been numerous and many of them ingenious. In *S. v. Winner,* 153 N. C., 602, at this term, from Wilmington, the defendant bought some small article at a store, and as he went out an unseen hand from behind a curtain handed him a drink. The jury and judge below properly held that this "scheme" would not avail. The counsel for this eminently respectable club, whose members merely seek to get their iced drinks without being termed lawbreakers, style this plan a "system." With the advent of prohibition numerous "systems" for the benefit of social clubs have been from time to time presented to the courts in different States. In one of the most recent of these, *Manning v. Canon City,* from Colorado, 23 L. R. A. (N. S.), 192, it was held: "The distribution of liquors kept by an unincorporated club to members who pay therefor sums which are used to replenish the supply of liquor, or to defray the expenses of the club, is a sale within the meaning of the prohibition law." In that case the Court, holding invalid a "system" very similar to that used here, called attention to the fact that when Prohibition was new the decisions of the courts, rendered by judges brought up under the old system, went very far towards exempting clubs of social respectability, the courts being often astute to find reasons therefor; but that now there has been a steady trend of the courts in the other direction, and the disposition is to enforce the law without discrimination or excuse. Hence many of the older cases are not authority. The cases cited by the Court, and the annotations to that case, sus-

tain this observation. To the same purport is *Maine v. Ka-pickso,* 23 L. R. A. (N. S.), 737. In *S. v. Minn. Club,* 20 L. R. A. (N. S.), 1102, the Supreme Court of Minnesota held: "The distribution of intoxicating liquors in less quantities than 5 gallons by a social club to its members, for a consideration, though without profit, constitutes a 'sale,' and is prohibited." In this State we need only refer to *S. v. Neis,* 108 N. C., 787, and *S. v. Lockyear,* 95 N. C., 635, for instances holding invalid other "systems" offered by social clubs.

A law ought to be construed in its spirit. No one can doubt that if, when the prohibition law was framed, it had been proposed to exempt social clubs, who could hire their barkeeper on wages, and pay cash in advance for their liquor, to be retailed to their members and friends, as is the case here, the proposition would have been voted down. A leading prohibitionist, who was found imbibing at a social club, was asked if he did not favor prohibition. He replied that he did—"for poor white folks and niggers." This is exactly what our Prohibition law amounts to, if it permits such acts as the defendant has been convicted of.

It must be remembered that the last General Assembly, Laws 1909, ch. 438, sec. 64, provided: "No social club for the dispensing of liquors shall hereafter be permitted or chartered." The presentment by the grand jury charged that the defendant had a United States liquor license; but that feature is not referred to in the "facts agreed."

The well-known expression, "equal rights to all and special privileges to none," is not a figure of rhetoric, but the truest expression of the American sentiment. If the law exempt liquor selling by social clubs, however respectable, by devices, however ingenious, it should permit it as to all others and without device. If a hole has been dug under the fence, the hole should be stopped or the fence torn down.

HOKE, J., dissenting: On the facts established by the special verdict in this case, I am of the opinion that the title to this beer was in the defendant, the Colonial Club, and that the transaction by which a portion of it was from time to time

passed over to the members constituted a sale, and in violation of our statute-law on the subject. If the matter could be properly regarded as a separated series of transactions, considering each one just at the point when it would favor defendant's position, some support might be found for the ruling by which defendant is to be exonerated; but, to my mind, the arrangement should be considered and dealt with as a whole, and in that view, as I interpret the verdict, it appears that the member desiring beer gave a statement of the kind and quantity to defendant's treasurer and manager, and paid him the amount of money required. This money was covered into the club treasury and became, in form at least, a part of its general funds. The treasurer then gave an order for beer to a nonresident dealer, sending the club's check for the price, and the beer was shipped to the defendant, and on arrival it was taken charge of by the treasurer and became a part of a general and larger quantity of beer in the care and control of the club, to be kept and cooled and handed over on demand of the members by the small. The order went from the club to the dealer, the money was taken from the general treasury and paid for by the check of the club's manager. The beer was shipped from the dealer to the club and became an unidentified part of a larger quantity of beer or other liquor procured on the same general plan. Such an arrangement clearly put the title to the beer in the club, and this result is not prevented by the fact that the name of the individual member was placed on the crate when it was shipped. It was sent to the club to be taken charge of by its treasurer and to become, as stated, a part of a general larger quantity of beer kept on hand for its members, and was so intended by all of the parties from the beginning. The title, therefore, passed from the dealer to the club, and when it was passed over to the individual member by the small on receipt of a coupon prepared for the purpose and representing value, this was a sale violative of law, and should be so considered and dealt with.

The *Grain Elevator cases* referred to and, to some extent, relied upon in the opinion of the Court bear very little resemblance

to the facts presented here, and even they are regarded by authors of approved excellence, Mr. Benjamin and others, as rather an exception to the general law applicable to sales.

The contrivance or "system" resorted to in this instance can hardly be classed as ingenious—it is too bald. It does not require a costly dwelling-place or an attractive environment to constitute a club, and if this transaction can be upheld as lawful, there is good reason to apprehend that the legislation we have enacted in the effort to minimize the evils of the liquor traffic will have been in vain.