### 4791.  DEAL *v.* THE STATE.

1. "All who procure, counsel, command, aid or abet the commission of a misdemeanor are regarded by the law as principal offenders and may be indicted as such."  The manager of a social club who orders intoxicating liquors for the use of its members, and who either directly or indirectly procures, counsels, commands, aids, or abets in the making of a sale of such liquors, is guilty as a principal.  This is true even though he may not have been present when the particular sale was made, and had no knowledge of it until after it was consummated.

2. Where a number of persons each contribute money to an agent, who purchases a stock of intoxicating liquor and thereafter dispenses, upon the order of one of them, a quantity of the liquor in exchange for a book of coupons purchased either by person or by the person to whom the liquor is delivered, the transaction is a sale in violation of the prohibition law, notwithstanding the persons for whose benefit the liquor was purchased compose a bona fide club, organized for social and intellectual welfare, and the use of the liquor is only an incident to the main purpose of the club, and although no profit is made on the sale.  And this is true whether they have become incorporated as a social club or whether they constitute a voluntary association of persons for mutual pleasure and benefit.

3. The provisions of the general tax acts of 1907 and 1909, imposing a license upon social clubs, do not authorize such oragnizations to engage in the sale of intoxicating liquors.

4. The evidence demanded the verdict, and no material error was committed.

DECIDED JANUARY 20, 1914.

Indictment for sale of liquor; from Lowndes superior court—Judge Thomas.  March 1, 1913.

*E. K. Wilcox, Akerman, Akerman & McManus,* for plaintiff in error.

*J. A. Wilkes, solicitor-general,* contra.

POTTLE, J. The plaintiff in error was jointly indicted with three others for selling intoxicating liquor to one Register, and excepts to a judgment overruling his motion for a new trial. The evidence shows that the accused was the manager of a social club in the city of Valdosta, which had paid the tax required by section 17 of the general tax act of 1909, and registered with the ordinary of the county as required by the provisions of that act. The club was conducted in connection with and as a part of a fraternal order, called the Valdosta Nest 1461 of the Order of Owls. The Order of Owls is a secret order having a constitution and by-laws, together with a ritual, and the local lodge is a voluntary association of persons and a subordinate branch of the order. The purpose of the organization is the advancement of its members socially, morally, intellectually, and otherwise. The local "nest" was duly organized in 1911. Its membership is limited to certain described persons, and the members are received and elected in substantially the same manner in which members are received and elected into the usual fraternal orders. In the early part of 1912 the lodge authorized the installation of a buffet, to be run in connection with the club, and circular letters were sent out to the members, requesting those who wished to enjoy the privileges of the buffet to subscribe $5, to form an amount with which to purchase a stock of intoxicating liquors. One hundred and twenty dollars was subscribed, and with this amount a stock of intoxicating liquors was purchased. Only those members who subscribed to this fund and their guests were allowed the privilege of the buffet. The scheme adopted was to sell to the members a book of coupons which could be exchanged for liquor corresponding in value to the coupons. In exchange for these coupons, liquors were dispensed either by the drink or in bulk. The liquor thus received from the common stock might be consumed in the club-rooms or disposed of in such other way as the members saw fit. The $120 subscribed as above stated was used for the purchase of the initial stock, which was replenished from time to time with funds paid for the coupon books which were received in exchange for the liquors. Register was not a member of the club, but was introduced and registered by a member as a guest, in accordance with the rules and regulations of the club. On the occasion referred to in the indictment Register was accompanied by a member to the club-rooms, where a coupon book was obtained by

the member and delivered to Register upon the payment by him of $1.25. This book was exchanged by Register with one of the employees of the club for a quart of whisky. It does not appear clearly from the evidence whether the sum paid by Register for the coupon book exceeded the cost of the whisky and the expenses of handling. Deal, the accused, was not present when this transaction took place, did not actively participate in it in any way, and had no knowledge of it until some time thereafter. He was manager of the buffet, and was paid a salary of $25 per month by the members, and devoted only a small part of his time to the business of the club. It was his duty to purchase the liquors kept by the club, keep the stock replenished from time to time, receive all moneys paid in by the members, and keep the accounts of the buffet, and all moneys received by him were deposited in the bank to his credit as manager, and checks on the bank were drawn by him against the fund as manager of the club. The accused knew of the system of distribution of liquors which had been put in operation by the trustees or governors of the club, and on other occasions had issued coupon books to members and received money therefor, and knew that the coupon books were being exchanged for liquors. There were upwards of 100 members of the club, and the evidence shows that during a period of about six or eight months the accused deposited in the bank, from the proceeds of the sale of coupon books, a sum in excess of $20,000.

1. If the transaction with Register amounted to a sale, Deal, the accused, was equally guilty with the man who actually furnished the liquor. All who participate, either as principals or accessories, in a sale of whisky, are equally guilty, because in misdemeanors there are no accessories. All who participate in the sale, either directly or indirectly, are guilty as principals. It is true that the person who furnished the liquor to Register was not an employee of the accused, but was employed and paid by the club. The accused was, however, a party to the transaction. He helped to put in operation the system of distribution which had been adopted by the club. He purchased the liquor and exercised a general supervision over the affairs of the buffet. He knew that transactions similar to the one with Register were taking place every day, and it was partly through his efforts that the system was kept in operation. The fact that he did not directly participate in furnishing the

liquor to Register and was absent from the club-house at the time, and did not know that the transaction had taken place until it was completed, will not excuse him. He helped to make it possible. He supplied the liquors with knowledge that they were to be dispensed in exchange for coupon books to members and their guests; he intended the liquors to be so dispensed, and he actively aided and abetted the scheme. He was clearly an accessory, and, as such, guilty as principal. *Mohrman* v. *State*, 105 *Ga.* 709 (32 S. E. 143, 43 L. R. A. 398, 70 Am. St. R. 74). As was stated by this court in the case of *Loeb* v. *State*, 6 *Ga. App.* 23, "all who procure, counsel, command, aid or abet the commission of a misdemeanor are regarded by the law as principal offenders, and may be indicted as such. The indictment may be joint against all those connected with the criminal enterprise, or it may be several against any one of them."

2. By the law of this State it is made penal "for any person within the limits of this State to sell or barter for valuable consideration, either directly or indirectly, . . any alcoholic, spirituous, malt, or intoxicating liquors, or intoxicating bitters, or other drinks which if drunk to excess will produce intoxication." Penal Code, § 426. It is, therefore, unlawful for any person, natural or artificial, or for any association of persons, to sell intoxicating liquors, either directly or indirectly, under any circumstances, and at any place, within the limits of this State. No scheme or device, however subtle, will serve as an evasion of this statute, if the method employed in any way involves the elements of a sale. We recognize the importance of the question raised in this case, involving as it does the validity of a scheme, put into operation by numerous social organizations in the State, having for its object the distribution of intoxicating liquors to the members and their guests, upon a plan which will be equitable to all, and under which each member will pay his just proportion of the expense. The question, however, is not a new one. It has been the subject-matter of numerous decisions in other States where either prohibitory or license laws have been enacted. It has not been precisely adjudicated either by this court or by the Supreme Court; and therefore it is proper to consider the rulings of other courts which have had occasion to deal with the subject. The decisions in other jurisdictions are in hopeless conflict. Courts of high standing and respectability have held that none of the elements of a sale are involved

in a transaction such as that disclosed by the present record, and that if the system of distribution was adopted in good faith by a bona fide social club for the benefit only of the members and their guests, it would not be illegal. These decisions all proceed upon the idea that the plan adopted is one merely for the equitable distribution of liquors owned either by a number of persons in common, or by a corporate entity organized by such persons. They hold, that, since it would not be obnoxious to the law for a number of persons each to contribute a specified amount of money and purchase and own and use a stock of intoxicating liquors in common, they may agree upon any plan of distribution satisfactory to themselves which would require each member to pay in proportion to the amount of liquor consumed by him. In furtherance of such a plan it is held that there is no objection to a number of persons employing an agent to distribute the liquor, either by the drink or otherwise, and to keep check upon the amount consumed by each person in order that a settlement may be had which is fair and equitable to all. Many of them go further, and hold that although the title to the liquors may be vested in a number of persons in common, each person may pay either in cash or its equivalent for liquors consumed by him, whether by the drink or otherwise, and the money so paid may be used to replenish the stock from time to time, and no sale will have taken place. The line of argument upon which these authorities proceed may be gathered from the following decisions. Thus in Klein v. Livingston Club, 177 Pa. St. 224 (35 Atl. 606, 34 L. R. A. 94, 55 Am. St. R. 717), it was held: "If an incorporated club is organized and conducted in good faith with a limited and selected membership, really owning its property in common, and formed for social, literary, or other purposes, to which the furnishing of liquors to its members is merely incidental and without profit, the furnishing of liquors to members is not a sale within the meaning of a liquor license statute restraining and regulating the sale of intoxicating liquors." See also Barden v. Montana Club, 10 Mont. 330 (25 Pac. 1042, 11 L. R. A. 593, 24 Am. St. R. 27). The Court of Appeals of New York has thus stated the rule: "If the object of its organization is merely to provide its members with a convenient method of obtaining a drink whenever they desire it, or if the form of membership is no more than a pretense, so that any person, without discrimination, can

procure liquor by signing his name in a book or buying a ticket or chip, thus enabling the proprietor to conduct an illicit traffic, then the sale of liquors by a club to its members is contrary to the provisions of the excise law. If, on the other hand, the club is organized and conducted in good faith, with a limited and select membership, as well as owning its property in common, and formed for social, literary, artistic, or other purposes, to which the furnishing of liquors to its members is merely incidental, in the same way and to the same extent as the supplying of dinners or daily papers might be, its furnishing of liquors to its members, though such liquors are paid for by them, is not a sale within the meaning of that law." People *v.* Adelphi Club, 149 N. Y. 5 (43 N. E. 410, 31 L. R. A. 510, 52 Am. St. R. 700). The whole argument upon which these decisions rest is summed up in the following quotation from the opinion in the case just cited. "We think that the transaction with Stark did not amount to a sale within the meaning of the statute. It was but a distribution among the members of the club of the property that belonged to them. The fact that a payment was made does not change the character of the act, for it was but the means adopted by which each member should receive his own and not that belonging to his fellow-member. The payment went into the treasury to ultimately restore that which he had taken." See also Commonwealth *v.* Smith, 102 Mass. 144; Commonwealth *v.* Pomphret, 137 Mass. 564 (50 Am. R. 340); Piedmont Club *v.* Commonwealth, 87 Va. 540 (12 S. E. 963). The case of State *v.* Colonial Club, 154 N. C. 177 (69 S. E. 771, 31 L. R. A. (N. S.) 387, Ann. Cas. 1912A, 1079), did not involve the exact question now presented. It was held that the transaction disclosed by the record in that case was not a sale, but Mr. Chief Justice Clark and Mr. Justice Hoke dissented, being of the opinion that the transaction amounted to a sale.

The decided weight of authority (at least numerically) is, however, against the view announced in the decisions above cited. See State *v.* Minnesota Club, 106 Minn. 515 (119 N. W. 494, 20 L. R. A. (N. S.) 1101); Manning *v.* Canon City, 45 Colo. 571 (101 Pac. 978, 23 L. R. A. (N. S.) 192); State *v.* Kapicsky, 105 Me. 127 (73 Atl. 830, 23 L. R. A. 737); South Shore Country Club *v.* People, 228 Ill. 75 (81 N. E. 805, 119 Am. St. R. 417, 10 Ann. Cas. 383); State *v.* Easton Social Club, 73 Md. 97 (20

Atl. 783, 10 L. R. A. 64) ; City of Spokane v. Baughman, 54 Wash. 315 (103 Pac. 14) ; State v. Neis, 108 N. C. 787 (13 S. E. 225, 12 L. R. A. 412) ; State v. Boston Club, 45 La. Ann. 585 (12 So. 895, 20 L. R. A. 185) ; People v. Law & Order Club, 203 Ill. 127 (67 N. E. 855, 62 L. R. A. 884) ; People v. Soule, 74 Mich. 250 (41 N. W. 908, 2 L. R. A. 494). A few years prior to the decision of the New York Court of Appeals in the case of People v. Adelphi Club, cited above, that court decided that a transaction somewhat similar to the one involved in the present case did amount to a sale, though the decision seems to be put partly upon the ground that the club was organized merely as a device for the sale of liquor. In the course of the opinion of Judge Danforth, it was said: "The liquor belonged to the association, not a legal entity as a corporation, but as joint owners or tenants in common. I do not say that circumstance distinguishes this case from one where the liquor is owned by an incorporated club; that need not be considered. It is the character in which they act. Five hundred men buy a quantity of liquor; they store it, and appoint an agent to manage it. On the application of one of the 500 the agent separates a small quantity from the mass of liquor, fixes its value, delivers the quantity so separated, as directed, and receives its value or price in money. What is that but a sale? It is not an evasion of the statute; it is a violation of it." People v. Andrews, 115 N. Y. 427, 431 (22 N. E. 358, 6 L. R. A. 128, 131). In *Mohrman* v. *State,* supra, it was held that the fact that the selling and drinking of intoxicating liquors was only an incident to the main object of the incorporation of a social club would not prevent the place where such liquors were dispensed and drunk from being a tippling-house, within the meaning of the statute making penal the keeping open of such houses on the Sabbath day. The question now involved was not passed upon in that case, but it is significant that in the opinion Mr. Justice Cobb, after quoting a definition of a tippling-house as "a place where intoxicating liquors are sold in drams of small quantities to be drunk on the premises," adds that the house under consideration in that case came within the letter of this definition. It appeared that the organization involved in that case was a social club similar to the one involved in the present case. According to the decided weight of authority, and also upon principle as it seems to us, it is immaterial whether

the club or association is a bona fide organization formed for the purpose of promoting social intercourse among its members. There can be no such thing in this State as a bona fide sale of liquor; nor can any person, corporation, or association of persons excuse the violation of a criminal law by showing that the main purpose of the organization was lawful, and that the criminal statute was violated as a mere incident to the main enterprise.

In the present case the trial judge submitted to the jury the determination of the question whether or not the local order of which the accused was manager was a bona fide social club. In overruling the motion for a new trial he was upon further reflection convinced that he was more favorable to the defendant than the law authorized. We fully agree with the trial judge in this view of the law. It may be conceded that the evidence demanded a finding that the local "nest" of the Order of Owls was a bona fide fraternal and social organization, formed for the purpose of promoting the social and intellectual welfare of its members; but this makes no difference. Any of its members who engaged in the sale of liquors are as amenable to the law as if one of them had, while in the club-rooms, committed murder or larceny or any other criminal offense. Nor does it make any difference that no profit was received from the sale of the liquor to Register. Sales are frequently made at a loss, and profit has never been regarded as an essential element of a sale. "A sale is the transmutation of property from one man to another in consideration of some price and recompense in value." 2 Bl. Com. 446. "It is a transfer of the absolute or general property in a thing for a price in money." Benj. Sales, § 1. "A sale is the passing of the title and possession of any property for money which the buyer pays or promises to pay." 7 Words & Phrases Judicially Defined, 6291, 6292. In 1 Mechem on Sales, § 1, is the following: "The essential elements here involved are that there must be (1) a transfer of (2) the general or absolute title to (3) a specific chattel, for (4) a price in money or a consideration in money. Sale is pre-eminently the transfer of the title." Again: "Sale means, moreover, the transfer of the absolute or general title. There may be other transfers of limited interests, such as the right of possession of some specific property in or lien upon the goods; but these, as will be seen, do not constitute a sale."

There can be, we think, no escape from the logic of the decisions which hold that a transaction of the nature of the one disclosed by the present record amounts to a sale. Let us analyze it for the moment. Before the separation from the common stock and the delivery of the quart of whisky to Register, some person other than himself was vested with the title; in other words he bought a quart of whisky from somebody and paid $1.25 for it. Counsel for the accused insist that if there was a sale, Register bought it from the member who introduced him. This can not be so, for the member never had any title to it which he could transmit to Register. But, suppose even this should be conceded, every person who aided or abetted the sale to Register would be equally guilty with the member. If the club was incorporated, the title to the whisky was in the corporation. It was ordered by the manager, its employee, acting under its direction, and when delivered the whisky became assets of the corporation. Suppose an incorporated club should be dissolved and its assets distributed, can it be doubted that a stock of liquors held on hand by it, which were ordered by its servant at its direction and kept by it for disposition among its members, corresponding to shareholders in an ordinary corporation, would be distributed just as any other of its assets and be subject to the payment of its debts? The law looks at the substance of things. So that if an agent of a corporation, with money in the treasury of the corporation, purchased property and received and held it for the corporation, in law the title would be in the corporation, without reference to what fiction had been used in making the purchase or in holding the property. If the shareholders in a corporation each contribute their own money, and this money is used for the purchase of property, the title thereto is in the corporation, and not in the shareholders. And so if the members of an incorporated social club contribute a sum of money and this money is exchanged for liquors, to be kept by the club for the use of the members, title to the liquors is as much in the corporation as is title to property in any other corporation when the property is purchased with money contributed to the shareholders and is held and used for their benefit. If one obtains whisky from a corporation by the payment of money, or its equivalent in coupons or in any other way, the transaction has all of the elements of a sale; title has passed out of the corporation and has been acquired

by the person who furnished the money or other thing of value. It is immaterial whether the transaction disclosed by the present record be treated as a sale by the club to the member, and by the member to Register, or as a sale directly from the club to Register; in either event the accused is guilty. Nor is the transaction to be regarded as any the less a sale because the club was unincorporated and simply a mere voluntary association of persons. If 100 people should order a barrel of whisky and each contribute an equal amount and pay for the whisky, the title would pass into all of them, and they would own the liquor in common. In such a case there would be no objection to a plan of distribution which did not involve the elements of a sale; but if each of these persons should be allowed to withdraw a drink at the time and pay therefor a price which had been agreed upon by all of them, the transaction would be a sale. It would be a sale because title to the drink had been in all of the persons in common; and when it was transmitted to the individual who paid therefor a price agreed upon, there was a sale by the ninety-nine to the one of all their interest in the whisky purchased. The infinitesimal interest of the one person in the drink thus obtained would not prevent the transaction from being a sale. "Tenants in common are such as hold by several and distinct titles, but by unity of possession, because none knoweth his own severalty and therefore they all occupy promiscuously." 2 Bl. Com. 191. "Tenants in common are such as have a unity of possession, but distinct and several titles to their shares." Tifton *v.* Vail, 42 Hun, 638, 640; 8 Words & Phrases, 6908. While the technical expression, "tenants in common," applies to owners of realty, still where several own personalty in common, the character of the ownership is the same; and while there is unity of possession, they hold under distinct and several titles.

If, however, the hundred persons should order a barrel of whisky for their joint use, and upon its arrival should agree upon its distribution in different quantities, each man paying, for the portion which he received, an equitable part of the whole cost, the transaction would be lawful, and there would be no sale. We may go one step further and say that it would not be a violation of law to employ a man to make the distribution and pay him for the services thus rendered; provided, of course, all this was done in good faith, and merely for the purpose of facilitating an equitable

distribution of the liquor. This man might likewise receive from each person the amount of money to be contributed by him, and the money so received might be lawfully expended by direction of the owners, to replenish the liquor which had been consumed. In such a case the person distributing the liquor and receiving the money would be the agent of the persons who received the whisky, and at all times the title to both the whisky and the money would be in the persons to whom the liquor was dispensed. If, however, there has been no agreement in reference to the quantum of interest which each has, it can not be said that any one has title to any particular part, and no title to any specified portion passes to him until after division among the several owners. So that, if one of the owners in common, or some person designated by him, buys and pays for any particular quantity of the property, it is a sale from all the owners to the one. Such a transaction involves the elements of a sale to the same extent and in the same way as if there had been the transmutation of title from one person to another for a quid pro quo. But unless there be, in advance of the purchase, payment in good faith of a specified amount of money by each person, or unless there is an agreement among them stipulating the quantity for which each shall pay, and each person receives the quantity for which he has agreed to pay or has paid, the transaction would be a sale and therefore obnoxious to the law.

We do not mean to say whisky may not be lawfully purchased by two or more persons in common, nor that it may not be held and used in this manner. But, as stated above, unless there is an agreement in advance as to the quantity which each is to receive, and the exact interest in the common stock which each is to have, there can be no escape from the conclusion that one who pays money and receives a portion of the liquor would be making a purchase from all having an interest in the common stock. We are not called upon, nor do we feel that it would be proper for us to undertake, to suggest a plan which would not be obnoxious to the law. The law is plain, and those who wish to avoid the consequences of its violation must adopt a plan which comes within the law. In seeking a plan which is within the letter of the law, it is well also to keep in mind its spirit.

The great object of the prohibition law is to lessen as far as possible the consumption of intoxicating liquors. This was the

evil which the General Assembly designed to correct. It declared its purpose in language clear and unmistakable. It is the duty of the individual citizen, no less than of the courts, to respect this law and lend assistance in carrying out its declared purpose. It was supposed that by prohibiting the sale of intoxicating liquors within this State the cause of temperance would be promoted and the consumption of liquors greatly lessened. Whether the law has accomplished its purpose or not is a matter which need not concern the judicial department of the government. The sale of liquor is absolutely prohibited in this State, and it is our duty to declare that every sale, direct or indirect, and every scheme or device which involves the elements of a sale, is in violation of the law; and we have no hesitancy in so declaring, whether the sale be participated in by one or more natural persons, or by an association of persons, or by a corporation.

3. The general prohibitory law was approved August 6, 1907. At the same session of the General Assembly the general tax act for 1908 and 1909 was passed, and it was approved August 22, 1907. The 47th paragraph of section 2 of that act is as follows: "Upon every club, corporation or association of persons who shall keep or permit to be kept in any room or place, or in any place connected therewith directly or indirectly, in which the members of such club, corporation or association assemble, or frequent, any intoxicating liquors, the sum of five hundred dollars; provided, that nothing in this section shall be construed to license or permit the keeping of any intoxicating liquors, in any place now prohibited by law or which may hereafter be prohibited by law." This tax was reimposed in the general tax act of 1909 in slightly different form; the tax being imposed in that act "upon every social or fraternal club, or corporation, association, or organization of any kind of persons," etc. Acts 1909, p. 42, section 17 (Code of 1910, § 933). According to the decision of the Supreme Court in *Miller* v. *Shropshire,* 124 *Ga.* 829 (53 S. E. 335, 4 Ann. Cas. 574), the imposition of this tax authorized the organizations mentioned in the act to keep on hand intoxicating liquors for the use of their members, provided they should not be kept in any place prohibited by law. In *Union & Mechanics Club* v. *City of Atlanta,* 136 *Ga.* 721 (71 S. E. 1060), it was held that the clubs and associations referred to in the tax act of 1909 are such "as are organized for the entertain-

ment and comfort of their members, and not for gain, and which have a fixed place of meeting, a definite organization, with a continuing existence, in contradistinction to an ephemeral gathering for a particular occasion with no idea of permanency in the fellowship or constituency of its members." It was further ruled that the tax imposed was not an occupation tax, but one laid, solely in the exercise of the police power of the State, and not a license "for the sale of or for the keeping on hand of intoxicating liquors in any place prohibited by law." See also *Teutonia Club* v. *Howard,* 141 *Ga.* 79 (80 S. E. 290). In *Wright* v. *Mayor &c. of Macon,* 5 *Ga. App.* 750 (64 S. E. 807), it was held that a social club such as that referred to in the tax acts of 1907 and 1909 had the right to keep intoxicating liquors on hand for the use of its members at a place which was neither a public place nor a place of business.

It is argued that at the time the general prohibitory law was passed it was a well-known fact that numerous social clubs were in operation in certain parts of the State, in which intoxicating liquors were dispensed to the members and their guests; that the method of dispensation was practically the same in all of these clubs; and that the General Assembly must have been advised both as to the existence of these organizations and as to the methods employed by them for the purpose of dispensing intoxicating liquors. From this counsel deduce that when, almost immediately after the passage of the general prohibitory act, the General Assembly imposed a tax "upon every club, corporation, and association of persons" keeping on hand intoxicating liquors for the use of its members, and when in 1909 the tax was reimposed "upon every social or fraternal club, or corporation, association, or organization of any kind of persons," it must necessarily have intended to refer to the social clubs which were then and had been in operation in the State for many years; and must have intended to sanction the method employed by them for dispensing the liquor. Some such argument as this seems to have met with approval in the case of Klein *v.* Livingston Club, supra, and in State *v.* Duke, 104 Tex. 355 (137 S. W. 654, 661, 138 S. W. 385). In the former case, referring to the statute under construction, it was said: "The plain implication is that the consumption of liquors in clubs as known to the legislature was not deemed a sale." If this argument could be accepted, the effect of the imposition of a tax upon social clubs would

be to repeal by implication the general prohibitory law so far as these clubs are concerned. No such construction of the tax act would be proper, unless the General Assembly had expressly authorized the sale of liquors in social clubs. Such, we conceive, was not the purpose of the tax act. It was designed merely as a revenue measure, to collect a license fee from social organizations which keep on hand intoxicating liquors for the use of their members. It did not intend to authorize the sale of such liquors, either to a member or to any one else. The only effect of the statute was to authorize clubs which had been formed for a legitimate purpose to keep on hand intoxicating liquors for dispensation to their members in a manner not prohibited by law. The statute was not designed to sanction any illegal distribution of intoxicating liquors. See *Teutonia Club* v. *Howard,* supra. Nor can it be said that the effect of the imposition of the tax in the language employed in the tax act amounted to a legislative declaration that the methods commonly employed by clubs to dispense liquors to its members would not amount to a sale. The legislative department has declared that every sale of intoxicating liquors is illegal, and the question as to what facts constitute a sale is a judicial question which must be determined by the courts.

4. The foregoing discussion disposes of every material question in the case. Under the view which we have taken of the law, the conviction of the accused was demanded by the evidence. The charge of the trial court was more favorable to the accused than he had any right to demand. The requests to charge were properly refused. It was not error to permit witnesses to testify to other similar transactions in the club which were participated in by the accused. This evidence was admissible for the purpose of showing that the accused was familiar with the method employed by the club to dispense intoxicating liquors, and actually participated in the illegal scheme.                    *Judgment affirmed.*