## 5855. GREEN v. CITY OF ATLANTA.

BELL, J. This case is controlled by the decisions of this court in *Wright* v. *State,* 14 *Ga. App.* 185 (80 S. E. 544), and in *Pitts* v. *City of Atlanta,* 14 *Ga. App.* 399 (81 S. E. 249); and the judge of the superior court erred in refusing to sanction the petition for certiorari.

*Judgment reversed. Wade, J., dissents.*

DECIDED JULY 3, 1915. JUDGE BROYLES BEING DISQUALIFIED, JUDGE BELL, OF THE ATLANTA CIRCUIT, WAS DESIGNATED TO SIT IN THIS CASE.

Certiorari; from Fulton superior court—Judge Pendleton. May 16, 1914.

*Daley & Chambers,* for plaintiff in error.

*J. L. Mayson, W. D. Ellis Jr.,* contra.

WADE, J., dissenting. I can not agree with the conclusion, reached by the majority of the court, that this case is controlled by the cases of *Wright* v. *State,* and *Pitts* v. *Atlanta;* and since the question is one of no little importance, and the opinion of the court in the last-named case was delivered by me, I think it proper to review the facts in this case and give the reasons for my dissent. To my mind the evidence disclosed in the petition for certiorari makes out a case which comes precisely under the ruling of this court in *Deal* v. *State,* 14 *Ga. App.* 121 (80 S. E. 537), and I think that the judge of the superior court properly refused to sanction the petition for certiorari.

Green was convicted in the recorder's court of Atlanta of the violation of an ordinance of that city prohibiting the keeping of spirituous, fermented, or malt liquors for unlawful sale. The evidence set out in the petition for certiorari was as follows: Moon, a city detective, testified that he knew the defendant, and when asked, "Where is his place of business?" said, "I have always seen him at the Eagles Club;" which he described as being in Atlanta. He said that Jones and Brandon went into this club in December, 1913, and Jones brought back and gave to him a half-pint of whisky, which the witness carried to the office of chief detective Langford, where it had since remained; that on the 13th of December, 1913, he talked with the defendant as to the latter's connection with that club, and the defendant then stated that he was manager of the Eagles Club. On cross-examination, when the witness was asked if it was not true that he met the defendant for the first time on the 15th of December, in the detective's office, he re-

plied that he did not remember, but he would say "probably he [the defendant] might have been there and came down later. I know I saw him in the chief's office, since you recall the occasion. I have a faint recollection that probably he wasn't there and a copy was left for him, and he came down later in the afternoon." He further admitted, on cross-examination, that he saw Jones "go into the club, the entrance to the club;" that he saw him go up in the elevator, but did not know of his own knowledge whether Jones actually went into the club itself.

W. J. Jones testified, that he did not know the defendant, but he knew where the Eagles Club was, and that he visited the club on December 11, 1913, together with Mr. Brandon; that he met Mr. Brandon, whom he had known previously, and together they went to the club, of which Brandon was a member; that Brandon had a key with which he opened the door, and they entered "some serving rooms, enclosed rooms, rooms that are partitioned off by curtains," which they passed through, and went into another room, "where the cashier stays, and got an order." The witness said that he gave Brandon the money and Brandon "signed the paper, and we got a half-pint of whisky and two drinks;" that they drank the drinks, but he gave the bottle of whisky to detective Moon; that he paid 40 cents for this half-pint of whisky, and the drinks and the bottle cost 65 cents altogether, he thought; that he could not say where the liquor came from that was brought to Brandon and himself, but "it was brought on a tray by a waiter;" that he gave Brandon the money and Brandon gave it to the cashier; that he was not a member of the Eagles Club, and had never been a member of that club, nor was he ever there before or since; that Brandon said that he (Brandon) was a member of the club, though he said he was in arrears with his dues; that he thought the cashier recognized Brandon as a member, and that both he and Brandon signed a register-book when they went in, and Brandon registered him from Los Angeles, California. The bottle of whisky alleged to have been purchased at the club was admitted in evidence without objection.

A. W. Brandon testified, in response to a question as to what connection he had with the Eagles Club in Atlanta on December 11, 1913, "I don't know what it was. I met Mr. Jones and I carried him up there to the Eagles Club and registered him from Los

Angeles, Cal., and I told him I would carry him up there." He said further (answering a question as to what right he had to buy a drink at this club), "I am a member of the Eagles, and I bought two drinks for thirty cents, and I bought a half-pint, which was forty cents, and we came back and went into the Fourth National Bank and drank it up." He testified that he himself paid for the drinks and the half-pint of whisky, and the whisky was taken out of his locker; that orders were always given to supply lockers ahead of time; that he gave an order to supply his locker with liquor to the defendant, the manager of the club, but he did not remember how much the order was for or when it was, though since he gave the order he had "gotten several drinks" of whisky, which he did not pay for when he ordered them, but paid for when he got the whisky; that the Eagles Club had about 400 members, who paid one dollar per month as dues and an initiation fee of 10 dollars, he thought; that he ordered "Kentucky Taylor" whisky for his locker, ordering so many quarts, but he did not recall how many. The witness further explained how members of the club got liquor from their lockers, and said a member would go to the cashier's stand and get an order and the waiter would bring the liquor to him; that the member would go in and sign a ticket and the liquor would be brought to him, and he would pay for it as it was brought to him; that a member would not pay for whisky when it was ordered, but would pay for it when he signed a ticket. The witness further said that his order to supply his locker was given by him before he and Jones went into the club on December 11, 1913; that he had ordered whisky put in his locker, and this order (on December 11) was for service from that locker; that Jones gave him no money, but he himself paid for the drinks and half-pint, that he drank the half-pint himself, and that neither he nor Jones saw detective Moon. In response to a question whether Green, the defendant, was an officer of the club at the time the witness gave to Green the order to stock his locker, referred to by him, he said Green "is manager of the club. He is manager of the Eagles Club."

(1)   It was insisted that the evidence for the city failed to show that Green, the defendant, was the manager of the Eagles Club on December 11, 1913, when Brandon and Jones visited the club and obtained two drinks and a half-pint of whisky for which 65 or 70 cents was paid, either by Jones or Brandon. The evidence of Moon

was that he knew Green, and, when asked where Green's place of business was, he replied that he had always seen him at the Eagles Club. Moon further testified that Green admitted to him on December 13, 1913, that he was then manager of the Eagles Club. At the trial, on April 17, 1914, Brandon testified, in response to the question, "Why did you give that order to Mr. Green, is he an officer of the club?" "Yes, sir, he is manager of the club." To the question "He is manager of the Eagles Club?" the witness replied, "Yes, sir." At the trial Green made no statement as to whether he was manager of the club at that time or was manager on December 11, 1913, when Brandon and Jones visited the club. Brandon further testified, that previous to the visit made by Jones and himself on December 11, 1913, he had given to the defendant, as manager of the club, an order to supply his locker with liquor, though he did not remember how much the order was for or when it was. So it appears that before Brandon and Jones obtained the whisky at the Eagles Club, Green was the manager in charge of the club (or of the locker feature thereof), to whom Brandon gave an order to stock his locker with liquor; that two days after the purchase of the whisky by Jones and Brandon, Green himself stated to Moon that he was *then* manager of the Eagles Club, and that on the day of the trial, April 17, 1914, Brandon, who stated he was a member of the club, testified that Green was *still* the manager of the club. We think, from all these circumstances, that the recorder was authorized to infer, to the exclusion of every other reasonable hypothesis, that Green was the manager on December 11, 1913, in the absence of anything whatsoever to the contrary.

Our code recognizes various presumptions of law, such as innocence, and in some cases guilt, of continuance of life for seven years, of a mental state once proved to exist, and "all similar presumptions," and provides that such presumptions may be rebutted by proof. Penal Code, § 1016. It is said in 1 Wigmore on Evidence, 514, § 437: "When the existence of an object, condition, quality, or tendency at a given time is in issue, the *prior existence* of it is in human experience some indication of its probable persistence or continuance at a later period. The degree of probability of this continuance depends on the chances of intervening circumstances having occurred to bring the existence to an end. . . So far, then, as the *interval of time* is concerned, no fixed rule can

be laid down; the nature of the thing and the circumstances of the particular case must control." In 1 Greenleaf on Evidence (16th ed.), 138, § 41, it is said: "Other presumptions are founded on the experienced continuance or permanency of longer and shorter duration, in human affairs. When, therefore, the existence of a person, a personal relation, or a state of things, is once established by proof, the law presumes that the person, relation, or state of things continues to exist as before, until the contrary is shown, or until a different presumption is raised, from the nature of the subject in question, in this way, continuance of ownership of property may be presumed; of possession of property; of residence; of an agent's authority; and the like." Again, in the same book (page 140, § 42) it is said: "On the same ground, a partnership, or other *similar relation* [italics ours], once shown to exist, is presumed to continue, until it is proved to have been dissolved." See also 2 Stark. Ev. 590, 688.

(2) As already stated, I do not agree with the majority of the court in the opinion that the case made out in the petition for certiorari is exactly covered by the case of *Pitts* v. *Atlanta* (supra), and I think that an examination and analysis of the facts recited in that case will show that there is a very marked difference between the proof connecting Pitts with the alleged sale of whisky in, near, or about the Beavers Club, of which he was admittedly the manager, and the facts connecting Green in the case under consideration with the purchase of whisky by Jones or Brandon in the Eagles Club. In the *Pitts* case it is expressly stated that it did not appear "that the alleged sale of liquor was made by permission or in conformity with the rules and regulations of the club, or by the actual or implied consent of any of its officers or members; nor (what is more important) does it appear that either of the sales testified to by the sole witness for the prosecution was made in the presence, or by consent, or with the knowledge, of the defendant, or that he ratified or approved the sale in any way; and, so far as the record discloses, the sales were made by parties unconnected with the club." In the present case it appears that the particular sale relied upon to show the unlawful purpose for which liquor was stored in the Eagles Club by the manager of that club, the defendant Green, was made in conformity with the rules and regulations of that club and therefore by the consent of its officers and mem-

bers. Though the evidence does not disclose that the sale shown by the testimony was made in the presence of the defendant, he was manager of the club and purchased whisky for the use of the members thereof, and must have had full knowledge of the manner in which the club was conducted and the sale must therefore have been by his consent and must have been ratified and approved by him, especially as it appears it was made by means of an order signed by the cashier of the club, who was presumably under his control as manager, and the whisky itself was served by a waiter in the employ of the club, who was thus connected therewith and was likewise presumably under the control of the manager. Green's connection with the sale of whisky at the Eagles Club was clearly shown by Brandon, who testified not only that he gave an order to Green, as manager, to stock his locker with whisky, but also that he had thereafter "gotten several drinks" from that particular locker, stocked by virtue of this order to Green, and that on December 11, 1913 (after the order was given), he obtained two drinks and a bottle of whisky from his locker at the club; thus showing that Green had complied with his request to order whisky of a certain brand for his consumption. It can readily be seen therefore that absolutely no reasonable parallel exists between the *Pitts* case and the case under consideration.

(3)  In the able opinion delivered by Judge Pottle for this court in the case of *Deal* v. *State* (supra), it is said: "'All who procure, counsel, command, aid or abet the commission of a misdemeanor are regarded by the law as principal offenders and may be indicted as such.' The manager of a social club who orders intoxicating liquors for the use of its members, and who either directly or indirectly procures, counsels, commands, aids, or abets in the making of a sale of such liquors, is guilty as a principal. This is true even though he may not have been present when the particular sale was made, and had no knowledge of it until after it was consummated." In the same case it is further held (p. 121): "Where a number of persons each contribute money to an agent, who purchases a stock of intoxicating liquor and thereafter dispenses, upon the order of one of them, a quantity of the liquor in exchange for a book of coupons purchased either by that person or by the person to whom the liquor is delivered, the transaction is a sale in violation of the prohibition law, notwithstanding the persons for whose

benefit the liquor was purchased compose a bona fide club, organized for social and intellectual welfare, and the use of the liquor is only an incident to the main purpose of the club, and although no profit is made on the sale. And this is true whether they have become incorporated as a social club or whether they constitute a voluntary association of persons for mutual pleasure and benefit." In the decision it is said (p. 129): "Before the separation from the common stock and the delivery of the quart of whisky to Register, some person other than himself was vested with the title; in other words he bought a quart of whisky from somebody and paid $1.25 for it. Counsel for the accused insist that if there was a sale, Register bought it from the member who introduced him. This can not be so, for the member never had any title to it which he could transmit to Register. But, suppose even this should be conceded, every person who aided or abetted the sale to Register would be equally guilty with the member. If the club was incorporated, the title to the whisky was in the corporation. It was ordered by the manager, its employee, acting under its direction, and when delivered the whisky became assets of the corporation." It is further said in the same decision (p. 130) that the transaction would not be regarded as any the less a sale should the club be unincorporated and a mere voluntary association of persons. And it is said: "If 100 people should order a barrel of whisky and each contribute an equal amount and pay for the whisky, the title would pass into all of them, and they would own the liquor in common. In such a case there would be no objection to a plan of distribution which did not involve the elements of a sale; but if each of these persons should be allowed to withdraw a drink at the time and pay therefor a price which had been agreed upon by all of them, the transaction would be a sale. It would be a sale because title to the drink had been in all of the persons in common; and when it was transmitted to the individual who paid therefor a price agreed upon, there was a sale by the ninety-nine to the one of all their interest in the whisky purchased. The infinitesimal interest of the one person in the drink thus obtained would not prevent the transaction from being a sale." It is further said (p. 131) that, "unless there be, in advance of the purchase, payment in good faith of a specified amount of money by each person, or unless there is an agreement among them stipulating the quantity for which each shall pay, and

each person receives the quantity for which he has agreed to pay or has paid, the transaction would be a sale and therefore obnoxious to the law." And speaking as to the construction of the prohibition act, Judge Pottle said in the same case (p. 134) that the statute authorizing the operation of social clubs dispensing intoxicating liquors "did not intend to authorize the sale of such liquors, either to a member or to any one else." It seems clear to me that where a member of a club directs the manager to order for him some whisky of a certain brand and place it in his locker, and thereafter obtains an order from the cashier of the club, upon which a waiter serves him with intoxicating liquor, for which he pays at the time he receives the liquor, this is a sale in violation of the prohibition law, under the decision in the *Deal* case, supra. Certainly nothing appears in the record in the case under consideration from which it may be determined that any definite amount of whisky was ordered by Brandon as a member of the Eagles Club, for which he was to pay the actual cost, together with the expense of transporting it and of actually serving it whenever the whisky so ordered was requested by him; but it appears that he simply paid what was demanded whenever and as he applied for the whisky for consumption, and clearly there was no "payment in good faith of a specified amount of money" by Brandon in *advance* of the purchase of the whisky for his locker by the defendant, nor does it appear that there was any agreement among the members of the Eagles Club, stipulating the quantity of liquor for which each member should pay, or that each person received the precise quantity only for which he had agreed to pay or had paid; and hence "the transaction would be a sale and therefore obnoxious to the law." *Deal* v. *State,* supra.

Evidently the whisky was ordered by the manager of the club and placed in the common stock, from which it was drawn out on tickets or orders issued by the cashier of the club to the members thereof, who paid for whatever they consumed at the time when they actually obtained it. It can not be supposed, from anything in the testimony of Brandon, that he was under contract to pay to the club or to Green a definite amount for any precise quantity of whisky, or that Green or the club could have called upon him to pay for more than whatever amount he might elect to use and pay for as used. The title to the whisky ordered by Green must have been in the club or in Green, and certainly was not in Brandon;

and, this being true, when Brandon asked for and obtained a certain quantity of that whisky and paid therefor at the time, even though he could only obtain it on an order signed by the cashier, it was nevertheless a sale to him, for *at that time* the title to the whisky then delivered passed, in consideration of the money then paid. The requirement that an order should first be given by the cashier amounted apparently to no more than a certificate to the effect that Brandon was a member of the club entitled, under its rules, to buy the whisky of the club, and was a mere device by which a sale was effected.

To contrast briefly the facts in the *Pitts* case with the facts in this case as I see them, it may be said that in the *Pitts* case there was no evidence that the sales which were proved to have been made in, near, or around the Beavers Club were made by an officer, agent, or employee of that club, or by any person connected therewith, or in accordance with the by-laws, rules, and regulations of the club, or by the consent of its officers or members, or that these sales were ratified thereafter by Pitts; the sales may have been made by an outsider without any authority from Pitts or from the club; and, since there was nothing to show that the manager, Pitts, was present and participating in or thereafter ratified these sales in any way, this court properly held that the evidence was not sufficient to warrant his conviction. In the present case the manager, Green, himself ordered for the members of the club the whisky which was afterwards served to them in a room of the club, which was provided with "serving rooms, enclosed rooms, rooms that are partitioned off by curtains," adapted to the convenience of parties desiring to partake of intoxicants with some degree of privacy, and intoxicants were served to members of the club as applied for by them on a check or order signed by the cashier in the employ of the club, and conveyed to the consumer by a waiter also in the employ of the club, and such intoxicants were paid for as obtained, and Green's knowledge as manager of the club and his connection with the system and plan by which the sales were so made was thus absolutely established and his ratification thereby sufficiently shown; so that in my opinion, under the decision in the *Deal* case, supra, Green participated in the unlawful sale and aided and abetted in effecting the same.

In the *Wright* case, supra, it was said: "One employed by such

a club as secretary and treasurer, and whose only duties are to collect the dues and fees from the members, keep the books, and look after correspondence for the club, and who does not in any other way participate in the illegal sale of intoxicating liquors by the club, is not guilty either of selling intoxicating liquors or of keeping them on hand at his place of business." In this case it appears that Green had other duties than those discharged by the manager in the *Wright* case, supra, for, according to the testimony of Brandon, he was charged with the duty of ordering the liquors consumed in the club, and did in fact order liquor to be thereafter purchased, and which was actually purchased by Brandon, one of the members of the club, in accordance with the rules and regulations of the club, and under the particular scheme or device adopted by this particular club to effect sales of intoxicating liquors.

If the *Deal* case, supra, is to be adhered to by this court, and if the rulings of this court as therein set forth mean anything, the transaction as set out by the evidence of Brandon himself was plainly in violation of law, and the liquor at the Eagles Club, which was under the control of the manager, Green, was stored and kept for the purpose of unlawful sale, since such a purpose may be inferred from one unlawful sale alone, and the proof was clear that the sale to either Brandon or Jones was unlawful. I think therefore that the judge of the superior court correctly refused to sanction the petition for certiorari.